The STATE of Ohio, Appellee,

v.

LASCOLA, Appellant.

[Cite as *State v. Lascola* (1988), 61 Ohio App.3d 228.]

Court of Appeals of Ohio,
Franklin County.

No. 88AP–407.

Decided Dec. 20, 1988.

230

*Michael Miller*, prosecuting attorney, and *Patrick E. Sheeran*, for appellee.
*James Kura*, county public defender, and *John W. Keeling*, for appellant.

WHITESIDE, Presiding Judge.

Defendant, John J. Lascola, appeals the judgment of the Franklin County Court of Common Pleas convicting him of two counts of rape and one count of attempted rape, and raises the following assignments of error:

"1. The defendant was deprived of his right to effective assistance of counsel when counsel agreed to stipulate to the admission of the results of a polygraph examination indicating the truthfulness of the prosecution's chief witness, failed to object to the introduction of such evidence when the state failed to establish a proper foundation for its admission, and also failed to request proper cautionary instructions concerning the use of polygraphic evidence as required by the Ohio Supreme Court.

"2. The trial court erroneously admitted prejudicial and improper testimony over the objection of the defendant.

"3. The prosecutor improperly asked questions, based upon inadmissible evidence, or lacking a factual basis, that prejudiced the defendant."

The complaining witness in this case is the defendant's stepdaughter, Brandy Jo Wheeler (née Botts). After the death in 1983 of his wife, who was Botts's mother, defendant and Botts moved to Columbus and lived with defendant's parents. Eventually, the relationship between the defendant and his stepdaughter deteriorated to the point where Botts was placed in the custody of Franklin County Children's Services. At a later point, Botts was placed in a foster home in which she felt comfortable. She was approximately sixteen when she came forth with allegations that the defendant had raped her. At trial she testified to three specific instances, all of which allegedly occurred within seven months of each other while the defendant and she were living with his parents. She was thirteen at the time of the alleged rapes.

There was also testimony at trial that Botts felt her stepfather was to blame for her mother's death, who had been killed as a result of a firearm being discharged that defendant had been cleaning at the time. On redirect, Botts was permitted over defense counsel's objection, to elaborate on why she felt defendant had "murdered" her mother.

Prior to trial, the defendant, defense counsel, and counsel for the state entered into a stipulation that permitted Botts to undergo a polygraph test. Regarding the admissibility of the results, it was specifically stipulated in paragraph four that:

"Such person designated by counsel for the State of Ohio shall be permitted, if called as a witness by the State of Ohio or the Brandy Botts [sic], to testify at trial of this cause as an 'expert' regarding all aspects of the test administered, and such testimony shall be offered and received as evidence in

the trial of this cause without objections of any kind by any party to this agreement except as to the weight of the evidence it is to be given. * * * "

The state introduced the testimony of Daniel Krebs, who was found qualified as an expert[1] and who administered the polygraph test to Botts. He testified that based upon his experience and the results of the test, Botts was telling the truth regarding her allegations of rape against the defendant. No graphs or charts were introduced to support Krebs's testimony. Further, the instructions to the jury did not include a special charge regarding how the jury should consider the results of the polygraph test.

Although defendant put forth evidence that could be construed in such a way as to support defendant's innocence, the jury returned a verdict of guilty. It is from this decision that defendant appeals.

By the first assignment of error, defendant contends that he was deprived of his right to effective assistance of counsel. The United States Supreme Court has set forth the appropriate test to be used in determining whether there has been ineffective assistance of counsel. This test was enumerated in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, as follows:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. * * * "

This two-step process to determine whether defendant had ineffective assistance of counsel was designed to accommodate the underlying purpose of the Sixth Amendment to the United States Constitution. The guide must be to ensure a fair trial. As the *Strickland* court stated at 686, 104 S.Ct. at 2064, 80 L.Ed.2d at 692:

" * * * The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result."

---

1. Krebs had taken a six-week course, attended some seminars and had some "on-the-job" training.

Prior to the decision in *Strickland, supra,* the Ohio Supreme Court set forth a similar standard in *State v. Hester* (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304. It was the same underlying principle which was stated in paragraph four of the syllabus:

"The test in determining if the accused had effective retained counsel is whether the accused, under all the circumstances, including the fact that he had retained counsel, *had a fair trial and substantial justice was done.*" (Emphasis added.)

Defendant sets forth several specific acts and omissions of his trial counsel upon which he bases his claim of ineffectiveness. These acts and omissions all center around the polygraph test and the accompanying stipulation.

The leading case in Ohio on the admissibility of polygraph results is *State v. Souel* (1978), 53 Ohio St.2d 123, 7 O.O.3d 207, 372 N.E.2d 1318. The Ohio Supreme Court set forth several conditions which must be followed in order to make the results of a polygraph test of the defendant admissible. The syllabus of *Souel* reads:

"The results of a polygraphic examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment, provided that the following conditions are observed:

"(1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

"(2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) If the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"(a) the examiner's qualifications and training;

"(b) the conditions under which the test was administered;

"(c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and,

"(d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

"(4) If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for

the jurors to determine what weight and effect such testimony should be given."

■ Those guidelines were taken directly from the Arizona Supreme Court case of *State v. Valdez* (1962), 91 Ariz. 274, 371 P.2d 894. The *Souel* court, 53 Ohio St.2d at 133, 7 O.O.3d at 212, 372 N.E.2d at 1323, adopted them " * * * because these requisites respond to the major objections to the admission of polygraph evidence. * * * " Thus, in Ohio, the results of a defendant's polygraph test are admissible only by agreement and only if all of the requirements of *Souel, supra,* are strictly complied with.

■ Based upon these guidelines, we turn to defendant's contentions that certain acts and omissions of his trial counsel constituted ineffective assistance of counsel. Defendant first asserts that he was denied effective assistance of counsel when his trial counsel entered into the stipulation allowing the results of the complaining witness's polygraph test to be admitted into evidence.

As noted previously, the guidelines of *Souel* specifically addressed the admissibility of a defendant's polygraph test results, not those of the complaining witness. Neither the state nor defense counsel cites any cases relating to the admissibility of polygraph test results of the complaining witness in a criminal case, and our research has found no reported Ohio case in which such evidence has been offered. As such, this case represents one of first impression in this state.

There is a difference between the defendant's stipulating to admission of his polygraph test and the defendant's stipulating that the complaining witness's polygraph test may be admitted. When a defendant agrees to undergo a polygraph test, presumably he knows whether he is telling the truth and is willing to assume the risk of error. It is completely within his knowledge and control whether to make the decision. Such is not the case with a witness, where defendant has no control or knowledge as to whether the witness believes that his testimony is truthful even though the defendant knows he is innocent. In addition, even the most avid advocate of the use of the polygraph will concede it is not perfect and that there is a margin of error compounded by reliance on the not infallible opinion of the "expert."

Defendant's trial counsel entered into an agreement that allowed the test results to be placed into evidence when the results of that test were completely out of the defendant's control or knowledge and were completely unpredictable. The stipulation would not have benefitted the defendant because it did not expressly allow him to introduce the results even had they been

favorable.[2]  Entering into an agreement that defendant take the test is different because it is the defendant's decision to take the test.  With all of the controversy regarding the reliability of polygraph tests, counsel must use the utmost caution in determining whether to stipulate to admissibility even of a test of the defendant himself.  No caution was used in this case involving a test of the prosecuting witness.

Not only are polygraph tests controversial, but the impact on the jury will be of tremendous effect where the "expert" is permitted to testify as to his opinion of truthfulness.  Abbel, Polygraph Evidence: The Case Against Admissibility in Federal Trial (1977), 15 Amer.Crim.L.Rev. 29, 53, aptly states the inherent prejudice in admitting polygraph test results:

"The use of the polygraph machine lends an illusory aura of objectivity and accuracy which is likely to mislead jurors into giving undue weight to polygraph examinations."

Taking all of these matters into account, we conclude that by entering into the stipulation which defendant's trial counsel did, counsel's performance was substantially deficient.  The stipulation regarding the results of a witness's polygraph test was, at best, a stipulation to the unknown.  It allowed the state to introduce the results if favorable, but did not expressly give the defendant the same option.  Such an agreement is unconscionable for both prosecution and defense and hopefully would not be enforced if the test were favorable to defendant.  The agreement was not entered into with the amount of caution that it should have received.  We leave open the question of whether a defense counsel can ever enter into a stipulation regarding the admissibility of a witness's polygraph test results.  But such a defense agreement could be proper, if ever, only under unusual circumstances, where after careful consideration, the agreement is found to benefit defendant.  Such was not the case here.

Under *Strickland, supra,* once counsel's performance has been shown to be substantially deficient, it still must be shown that the deficiency prejudiced defendant so as to deny him a fair trial.  The *Strickland* court set forth the test for determining prejudice as follows:

" * * * The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to

---

**2.**  The stipulation, *supra,* permits only the state or the witness, Brandy Botts, to use the results of the polygraph test.  Perhaps the drafter could not conceive of an agreement to permit use of a polygraph test other than that of defendant himself.

undermine confidence in the outcome." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

■ Thus, defendant need not show to a certainty that the outcome would have been different, but rather, only that there is a reasonable probability that the outcome would have been different but for the ineffective assistance of counsel.

The state's evidence against the defendant was based primarily upon Botts's testimony. The expert witness, based upon the results of the polygraph test, testified that Botts was telling the truth, but defendant presented several witnesses who contradicted Botts's testimony. By returning a verdict of guilty, the jury necessarily found that Botts was more credible than defendant's witnesses. There is no way for this court to determine precisely the total impact of the polygraph test results upon the jury. However, the introduction of the "expert's" opinion changed the focus from testing Botts's credibility by ordinary standards to a determination of the accuracy of the polygraph test results and the reliability of the "expert's" opinion.[3] *Souel,* 53 Ohio St.2d at 133, 7 O.O.3d at 212, 372 N.E.2d at 1323–1324, specifically recognizes the problem of undue reliance on the expert's testimony. The effect of having a known expert tell the jury that the complaining witness is almost certainly telling the truth is obvious. There is at least a reasonable probability that without the results of the polygraph tests and the "expert" opinion, the outcome of the trial would have been different.

Defendant contends that even if the stipulation of such a polygraph test did not amount to ineffective assistance of counsel, his counsel at trial did not take steps to assure that the *Souel* requirements were met. Although this court finds that by stipulating to the admissibility of the polygraph test results, defendant's trial counsel's act constituted ineffective assistance of counsel, counsel's conduct at trial adds to this conclusion.

■ As stated previously, *Souel, supra,* dealt with the admissibility of defendant's polygraph test results and not those of a witness. However, assuming there may be a circumstance where a stipulation as to a witness would be proper, at a minimum, the same requirements that apply to a defendant's polygraph testing procedure should also apply to the admissibility of *any* polygraph test results in a criminal matter. These requirements are

---

**3.** Botts's responses which the "expert" testified were truthful were not even related in time to the charges against defendant, but instead, were responses to general questions of alleged sexual conduct between defendant and the witness at some unspecified time. Defense counsel did object for this reason but the trial court erroneously overruled the objection. Time of the offense is particularly important herein since the punishment depends upon the age of the minor.

minimum safeguards established to ensure the fairness of the proceedings. Therefore, we agree with defendant that if polygraph test results of a witness can ever be admitted, the requirements of *Souel* must be met.[4]

First, defendant contends that his counsel's failure to object when a proper foundation was not established for admission of the results of the polygraph test constitutes ineffective assistance of counsel. At trial, no graphs or charts regarding the polygraph test given to Botts were offered into evidence. Defense counsel asked the expert if he had brought the charts and graphs of the test with him. When the expert replied that he had not brought anything with him, defense counsel failed to pursue the matter further. The expert testified that he had relied on these charts for his opinion that Botts was telling the truth.

*Souel, supra,* requires that such graphs and charts be admitted into evidence. Paragraph one of the syllabus states specifically:

"The results of a polygraphic examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment, *provided that the following conditions are observed:*

"(1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test *and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state."* (Emphasis added.)

This rule is in accordance with Evid.R. 703, which requires:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

The stipulation signed in this case did not specifically provide that the graphs or charts relied upon by the expert had to be offered into evidence, but *Souel* requires it and it is implicit in the stipulation. Additionally, the stipulation did not specifically permit expert opinion testimony, but instead stated only that the expert could testify "regarding all aspects of the test administered." Counsel's deficient performance in allowing, without objection, the expert's opinion testimony without such graphs and charts is compounded by the trial court's complete disregard of the requirements of *Souel.* Actually, even under *Souel,* the admissibility of opinion testimony on the basic issue of whether the witness answered truthfully on the determinative questions is highly questionable. The opinion *testimony* should be limited to

---

**4.** See *State v. Stanislawski* (1974), 62 Wis.2d 730, 216 N.W.2d 8, and *State v. Molina* (1977), 117 Ariz. 454, 573 P.2d 528, both of which apply the same requirements to all polygraph test results.

testimony concerning the meaning of the test results in general and the specific results of the test as administered without opinion as to truthfulness.

Before considering the prejudicial effect of this conduct, we turn to defendant's second contention that his counsel's failure to ask for the limiting instruction of *Souel* also constituted ineffective assistance of counsel. Specifically, *Souel* states in paragraph four of the syllabus:

"If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given."

When the *Souel* court decided to permit the admission of such tests, it did so with a great degree of caution and the idea that the trial court would retain full supervisory power. The reason for the limiting instruction is to prevent the jury from placing undue reliance on the polygraph test results. In the present case, no limiting instruction was requested by defendant's trial counsel on the record or given by the trial court. Regarding the expert testimony, the court instructed the jury as follows:

"Generally a witness may not express an opinion; however, one engaged in a particular profession may express his opinion because of his education, knowledge, and experience. Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict.

"You must decide what weight, if any, should be given to the testimony of an expert. In determining its weight, you may consider the expert's skill, experience, knowledge, veracity, familiarity with the facts of this case, and the usual rules for testing credibility in determining the weight to be given to testimony."

This instruction does not even begin to constitute the limiting instruction which is required by *Souel*. The court's actual instruction in no way is designed to admonish the jury not to place undue reliance on the results of the polygraph test. Without an objection, counsel permitted the jury to rely solely upon the results of the polygraph test to determine the credibility of the complaining witness. However, there is also a duty upon the court itself under *Souel*, and a failure to give the proper charge constitutes plain error.

Defendant's trial counsel not only allowed the testimony of an expert witness without objection as to the lack of a proper foundation, but his performance was further deficient in failing to request a limiting instruction or objecting when it was not given. However, as we noted above, the trial court also failed in its obligation under *Souel*. Applying the *Strickland* test for prejudicial effect, this court finds that but for defense counsel's "unpro-

fessional errors," and the trial court's plain error, there is a reasonable probability that the result would have been different.

In *Souel*, the court specifically recognized that the trial judge plays an important role in supervising the admissibility of polygraph tests. In paragraph two of the syllabus, the court stated:

"Notwithstanding the stipulation, *the admissibility of the test results is subject to the discretion of the trial judge,* and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence." (Emphasis added.)

By allowing the polygraph results to be admitted without a proper foundation and by not giving a limiting instruction to ensure that such results would not be given too much weight, the trial court committed plain error. Defendant's ineffective assistance of counsel and the trial court's failure to fulfill its duty under *Souel* worked together to deny the defendant a fair trial. As stated previously in *Hester, supra,* defendant's ineffective assistance of counsel claim is measured against whether defendant "had a fair trial and substantial justice was done." Here, substantial justice was not done, not necessarily in the final result, but in the manner in which that result was reached. Accordingly, defendant's first assignment of error is well-taken.

By the second assignment of error, defendant contends that prejudicial and improper testimony were admitted by the trial court. The testimony in question relates to Botts's cross- and redirect examination. On cross-examination, she was asked questions regarding her mother's death and she testified that she blamed the defendant for her mother's death. The state agrees with the defendant that this questioning was proper to establish bias.

However, on redirect, the following questions were asked of Brandy:

"Q. Brandy, I just have a couple questions for you, then we'll be all done.

"You were asked by Mr. Larson if you believed that the defendant murdered your mother, and I think your response was, 'in all honesty, yes;' is that correct?

"A. Yeah.

"Q. And then he went on to ask you if you believed that the defendant had murdered your mother back at the time it happened, and your response was no; is that correct?

"A. Correct.

"Q. When did you change your opinion about that or change your thoughts about that?

"Mr. Larson: I'm going to object.

"The Court: Objection overruled.

"Q. (By Mr. Green) You may answer the question.

"A. My aunt, which is my mother's sister—

"Mr. Larson: Object to hearsay, if she's going to say what her aunt said.

"The Witness: I've seen the letters.

"Mr. Green: Your Honor, I'm not offering it for the truth of the matter. I'm simply offering it so the witness can explain why she changed her mind about what she believed happened. It's not hearsay.

"The Court: All right. If she—just a minute. If she states what someone else said, it's not for the purpose of what someone else said was true but that it was said. That's the only reason for it.

"Mr. Green: Just to show why she changed her belief—

"The Court: All right. The objection's overruled.

"Q. (By Mr. Green) Brandy, you were saying what made you change your mind as to your belief as to what happened.

"A. The fact of the police report, the investigation report, it came up that there was a second bullet in the gun.

"Q. Okay. Any other factors?

"A. The fact that there was a large insurance policy taken out on my mom shortly before her death.

"Q. Any other factors?

"A. And his talk to different family members as to where my mother was when she was shot.

"Q. Did that differ in any way from what you had learned earlier?

"A. Yes. They all differed. Every one was different.

"Q. Each time he'd tell someone else.

"A. Yes.

"Mr. Larson: I've got to object. This has got to be hearsay on top of hearsay.

"The Court: Objection overruled.

"Q. (By Mr. Green) Now, Brandy, you—turning your attention back to the first incident that we discussed, that being mid-October of '83, you indicated that that occurred shortly after you moved back to Columbus.

"A. Yes.

"Q. Before your mother's death, were there things that occurred up in Huron that made you want to leave that household?

"A.  Yes.

"Q.  Were your—was your mother made aware of those things?

"A.  Yes, she was.

"Q.  And to the best of your knowledge, was she making or had she made any plans or preparations to remove you from that household?

"Mr. Larson:  Object, your honor.

"The Court:  Objection overruled.

"Mr. Larson:  How does she know what her mother—

"The Court:  He asked her if she knew.  Your objection's overruled.  I don't want to argue with you, counsel.  The witness will answer the question.

"Q.  (By Mr. Green) If you know, did your mother—or was she making preparations to remove you from that household?

"A.  Yes, she was.

"Q.  And how long after that was it that she met with her death?

"A.  Just a short time."

The witness was permitted to testify at length regarding why she felt the defendant had murdered her mother.  This testimony was completely irrelevant, as it had no probative value whatsoever.  Evid.R. 401 defines "relevant evidence" as follows:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The issues of consequence in this case deal with whether the defendant had raped his stepdaughter.  It is impossible to see how Botts's testimony regarding her belief that defendant murdered her mother had *any* tendency to prove or disprove an element of the crime with which defendant was charged.  The testimony related to wholly collateral and irrelevant issues, and as such should not have been permitted.  While evidence of ill will or bias (or lack thereof) is admissible as bearing upon credibility, evidence attempting to prove the ill will or bias to be well founded and justified is totally irrelevant and inadmissible.

The state's introduction of such testimony was an attempt to show that defendant had a bad character so egregious that he was a murderer who had not been convicted.  The only purpose of proving defendant to be a murderer is to show it to be more likely that he committed rape as well.  Such evidence is clearly prohibited by Evid.R. 404(B), which states:

"Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

By admitting such testimony over defense objection, the trial court committed prejudicial error. Accordingly, defendant's second assignment of error is well-taken.

By the third assignment of error, defendant contends that during the state's cross-examination, the prosecutor "improperly asked questions based upon inadmissible evidence, or lacking of a factual basis * * *." Again, these questions related to the death of the victim's mother and, as already stated, these questions were patently irrelevant and improper. It was a further attempt to show defendant had a bad character and is clearly prohibited by Evid.R. 404(B).

The state also asked questions of the defendant that implied that he had sex with the victim on more occasions than those charged in the indictment. The testimony was as follows:

"Q. Mr. Lascola, isn't it, in fact, true that you started having sex with Brandy when she was about 13 years old?

"A. No, sir.

"Q. Further, that you had sex with her regularly for a period of two years?

"A. No, sir.

"Mr. Larson: Object, your Honor.

"Q. (By Mr. Green) Further, that you threatened Brandy to the point—

"The Court: Just a minute. Objection overruled."

The Ohio Supreme Court, in *State v. Thompson* (1981), 66 Ohio St.2d 496, 20 O.O.3d 411, 422 N.E.2d 855, addressed the admissibility of "evidence of previous or subsequent criminal acts, wholly independent of the criminal offense for which a defendant is on trial * * * ". *Id.* at 497, 20 O.O.3d at 412, 422 N.E.2d at 856. The court, at 497, 20 O.O.3d at 412, 422 N.E.2d at 856, held *per curiam:*

" * * * [E]vidence of other criminal acts of a defendant is admissible *only* when it 'tend[s] to show' * * * [motive, intent, absence of mistake or accident, or scheme, plan or system in doing the act], and *only* when one of those matters is relevant to proof of the guilt of the defendant of the offense in question. * * * "

The subsequent acts in *Thompson* were identical to the ones the state brought out here. Just as the *Thompson* court found such subsequent-acts testimony to be improper, the trial court's admission of evidence of subsequent acts of the defendant was improper. This testimony did not relate to any plan or motive, but served purely to prejudice the jury against the defendant. As such, it was inadmissible. Here, the other acts did not have a temporal, modal or situational relationship to the crime for which defendant was on trial. Nor was motive, intent, mistake or accident placed in issue. See *State v. Curry* (1975), 43 Ohio St.2d 66, 72 O.O.2d 37, 330 N.E.2d 720, and *State v. Burson* (1974), 38 Ohio St.2d 157, 67 O.O.2d 174, 311 N.E.2d 526. Accordingly, defendant's third assignment of error is well-taken.

For the foregoing reasons, all of the defendant's assignments of error are sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN and BROWN, JJ., concur.

WILLIAM F. BROWN, J., retired, of the Coshocton County Common Pleas Court, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.