OPINION
Antwon Fisk was indicted by a Franklin County grand jury on June 19, 2000 on two counts of robbery and one count of kidnapping. As indicted, the two robbery counts were felonies of the second and third degree, respectively; the kidnapping count was indicted as a first-degree felony. As detailed below, the charges stemmed from the alleged robbery of the owner of Schall Hardware, Clovis Schall, on June 9[1], 2000.
An attorney was appointed at arraignment to represent Mr. Fisk. The attorney promptly filed a motion seeking suppression of the testimony of Mr. Schall with respect to his out-of-court identification of Fisk as the man who robbed him.
Mr. Fisk's trial date was continued numerous times. An entry was filed on October 11, 2000, which indicated that Fisk sought another continuance to allow him "additional time to consider * * * a proposed stipulation" regarding his taking a polygraph examination.
Another continuance entry dated December 5, 2000, indicated Mr. Fisk's decision to schedule the "stipulated polygraph." An "Entry of Stipulation of Use of Polygraph," personally signed by the defendant, was filed on December 6. Finally, pursuant to an entry journalized December 15, 2000, Fisk was ordered to be transported to the Columbus Police Department for purposes of taking the polygraph examination.
As discussed below, Mr. Fisk failed the substantive aspects of the polygraph examination. The results were first presented to the court and parties via a letter dated January 9, 2001, from Columbus Police Officer Cathy Collins-Taylor, a "certified polygraphist." The case was then scheduled again for trial, and again continued.
Mr. Fisk then moved the court for the appointment of substitute counsel. The trial court journalized an entry on March 12, 2001, appointing the Franklin County Public Defender to assume Fisk's representation. The case was continued once again to allow new counsel time to prepare for trial. Issues pertaining to Fisk's legal representation are the subject of his first assignment of error.
A jury trial commenced on July 16, 2001. On July 20, the jury returned guilty verdicts as to all counts. The trial court ordered preparation of a presentence investigation report and scheduled the case for sentencing in September.
After merging the two robbery counts, the trial court sentenced Mr. Fisk to two concurrent prison terms of five years. The trial court journalized the verdict and sentence pursuant to an entry filed September 21, 2001. The trial court also appointed new counsel to represent Fisk on appeal.
Antwon Fisk (hereinafter "appellant") has timely appealed, assigning two errors for our consideration:
 I. Appellant's attorneys were ineffective, thereby denying him his right to effective assistance of counsel as guaranteed by the United States and Ohio Constitutions.
 II. The trial court erred to the prejudice of the appellant by allowing an in[-]court identification of appellant by the state's witness, in violation of appellant's right to due process of law under the Fourteenth Amendment to the United States Constitution.
On appeal, the state concedes the essential facts adduced at trial as delineated in appellant's brief. (Appellee's brief at 1.) Nonetheless, given the analyses required by appellant's assigned errors, we undertake an independent review of the evidence.
Clovis Schall testified that at approximately 4:00 on the afternoon of June 9, 2000, a man who appeared to be a customer entered his store, Schall Hardware. The store is located at 1885 East Livingston Avenue in Columbus. At the time of the incident, Mr. Schall was seventy-six years of age, and had owned and worked at his store for fifty-four years.
According to Mr. Schall, he believed that the man was a customer because he (the "customer") put some items on the counter and appeared to be in the process of purchasing them. However, the man "had [Schall] walk back in the store and then * * * [the assailant] jumped the showcase and [threw]" Schall down on the ground and tied him up. In addition to tools, the assailant also took money from the cash register. (Tr. 57-58; 74-75.)
Mr. Schall testified that the lighting inside his store was good and that he "got a * * * pretty good look" at the man. Schall was soon able to untie himself, and he immediately called the police. The record indicates that the victim's phone call led to a radio broadcast of a description of the robber. After declining medical treatment for visible injuries to his arms and hand, Schall was put in the cruiser and taken a short distance away for a "show up" identification procedure, where appellant was in the custody of several other police officers. At that time, Schall identified appellant as his assailant. (Tr. 58-59; 74-75.)
Lawrence W. Jordan testified on behalf of the state. At the time of the incident, Mr. Jordan was employed as a construction inspector for the city of Columbus. During the afternoon of June 9, 2000, Jordan was in his vehicle, completing reports and other paperwork "at the corner of Livingston and Seymour" when he was approached by a man who tried to sell him tools. Jordan, who by occupation is familiar with construction tools and equipment, specifically identified a "four-foot American, American level, brand name." The man said "he'd take 25 bucks for it * * *." Mr. Jordan testified that $25 would be "a bargain" for this level, which he believed was "brand new." The man was also in possession of a "mason's bag," a white canvas bag customarily used by brick and block layers. (Tr. 145-149.)
According to Mr. Jordan, eleven minutes elapsed between the time he was offered the level and the time the police arrived. When the prosecution asked Jordan if he could identify appellant in court as the man who offered to sell him the level, he "couldn't swear to it." Instead, the witness essentially noted some superficial differences in physical appearance between the man who tried to sell him the level and appellant as he sat before him in court. Jordan recalled that, when the man approached him, the man wore a plaid shirt and blue jeans, and that he had longer hair and wore wire rim glasses. (Tr. 147-149.)
Mr. Jordan was present when the police arrived, detained the man, and retrieved the tools. Jordan informed the officer about what had just occurred. Jordan concluded his testimony by estimating that his site was "five, maybe six blocks west" of Schall Hardware, a store he "used to buy tools off of * * *." (Tr. 149-150.)
Several police officers involved in appellant's arrest testified at trial. While their testimonies are consistent in most relevant respects, there are some inconsistencies in the particulars of the identification process, as addressed below in our discussion of the second assignment of error.
Columbus Police Officer Cathy Collins-Taylor testified regarding the results of the polygraph examination she administered to appellant. As indicated infra, appellant "failed" the test. In polygraph vernacular, appellant's responses to substantive questions were "deceptive." In particular, appellant responded deceptively when asked if he tied-up and robbed Mr. Schall.
Appellant presented no evidence at trial.
Although appellant did not testify at trial, his explanation of events was explained to the jury through the testimony of the polygraph examiner regarding her "prepolygraph interview" with him. He acknowledged that he had been in the vicinity of the hardware store at the time Mr. Schall was robbed; however, appellant denied committing the robbery. Appellant claimed that he saw a man hide a canvas bag in some bushes. Appellant looked inside and saw "new tools in the bag * * * some of them still in the wrappers." Appellant took the bag and tried to sell the tools twice: first, "to somebody that wouldn't buy them, and then to a person that he said ended up working, he found out later, ended up working for the city."[2] (Tr. 110-112.)
Since the nature of the issue raised in appellant's second assignment of error is potentially dispositive of criminal appeals generally, we address it first. By his second assignment of error, appellant contends that the trial court committed prejudicial error by allowing an "in-court identification" of him by the victim.
Prior to Mr. Schall's "in-court" testimony, he and two police officers testified outside the jury's presence as a result of the motion filed by appellant's first attorney seeking suppression of Schall's identification testimony.
Columbus Police Officer Clifford Ward testified that he was in the immediate vicinity of the crime scene when he responded to a "radio-aired" description of the Schall Hardware robbery suspect. Within minutes, he saw a man fitting the description. The man was carrying a white canvas tool bag. As a result, he apprehended appellant. According to Ward, Mr. Schall, who was brought to the scene by another cruiser, "* * * just pointed at [appellant] and said `That's the guy.'" On direct examination, Ward "didn't believe" that the tools "were placed with [appellant] at the time Mr. Schall made his identification." (Tr. 38-43.)
On cross-examination, Officer Ward acknowledged that appellant was in the backseat of the cruiser until another cruiser arrived with Mr. Schall. Upon Schall's arrival, appellant was ordered to "* * * get out of the car, stand and face the cruiser where Mr. Schall was." At that time, appellant "* * * was surrounded by * * * at least three * * * police officers * * *." Ward could not recall whether Schall "* * * ever got out of the [cruiser] that he was brought in." (Tr. 46-48.)
Columbus Police Officer Charles Distelhorst responded to the crime scene and soon learned that "* * * another cruiser had advised they had a possible suspect in custody." He picked up Mr. Schall and "* * * brought him to the other officer's location for a field identification." Distelhorst denied telling the victim that officers believed they had "* * * a good or a likely suspect * * *." The officer observed Schall's reaction when he (Schall) saw appellant. The officer testified that Schall said, "`That's him, that's him, that's my stuff.' Because there was also some tools sitting there, big long level." Distelhorst described Schall's reaction as "* * * an instant identification." (Tr. 49-51.)
On cross-examination, Officer Distelhorst explained that because he was transporting the victim immediately to another location, the officer informed him that "* * * some officers had a gentleman detained we needed him to take a look at." The officer acknowledged that "* * * there was only one guy in custody" and that he was taken out of the backseat of the cruiser "* * * and had him [appellant] stand there and had Mr. Schall look through the cruiser window at him." According to this officer, "* * * the tools were sitting on the * * * trunk lid" of the cruiser from which appellant was removed for identification. In other words, appellant was "* * * right next to the tools when he got out of * * *" the cruiser. (Tr. 53-54; emphasis added.)
Given its significance, we quote at length Mr. Schall's testimony regarding his "out-of-court identification" of appellant.
 [PROSECUTOR]. Now, before they showed him to you, did either of the officers, any of the officers say or do anything to tell you that this person was the one who had robbed you?
 [SCHALL]. Well, they didn't have to. He had the merchandise on his person.
[PROSECUTOR]. Could you identify him at the time?
[SCHALL]. Yes, I did, sir.
 [PROSECUTOR]. If he didn't have the merchandise on him, would you have still been able to identify him?
[SCHALL]. Well, that would be debatable.
THE COURT: Pardon me. What did you say?
[SCHALL]. That would be debatable really.
[PROSECUTOR]. Did you get a good look at him?
[SCHALL]. Well, yeah.
[PROSECUTOR]. And did you
 [SCHALL]. Well, you know, I don't stand and stare at my customers, you know.
 [PROSECUTOR]. Did you get a good look at him when the police cruiser, when you were in the police cruiser?
[SCHALL]. Yes, I sure did.
 [PROSECUTOR]. And is there any doubt about the identification that you made when you were in the police cruiser?
[SCHALL].
No.
[PROSECUTOR]. Can you tell us?
 [SCHALL]: It was him. He's standing there with the merchandise in his possession.
 [PROSECUTOR]. Did he have it in his possession when you identified him from the cruiser?
[SCHALL]. Yeah. Yeah.
* * *
 [SCHALL]. He was it was in the cruiser or I don't know whether he still had it in that bag, he had it in a tool bag, and a level, four-foot level and a tool bag full of tools.
 [PROSECUTOR]. Okay. And do you remember where the four-foot level and the tool bag full of tools were when you identified him?
 [SCHALL]. Well, it was in the cruiser at that time. Because between the time they come and got me at the store, they put him and the merchandise in the cruiser. I guess that would be the way it would be.
 [PROSECUTOR]. How much time was there between the time that you were robbed and the time that you identified the person in the cruiser?
 [SCHALL]. I would say around a half an hour. [Tr. 59-61; emphasis added.]
This concluded the hearing on the suppression issue. Ultimately, of course, the trial judge overruled the motion, concluding that the identification procedure was not "* * * so suggestive that there was a very substantial likelihood of irreparable misidentification." (Tr. 68.)
Mr. Schall's testimony before the jury was in all relevant respects consistent with his testimony during the suppression hearing, including, most significantly, his "debatable" identification of appellant. In fact, as the state observes, Schall's "in-court identification" was, consistent with his earlier testimony, actually of the stolen merchandise found in appellant's possession.
As indicated infra, appellant was first identified as the assailant by Mr. Schall via a procedure referred to in common parlance as a "show up" the victim was taken to a scene to identify a potential suspect. This procedure is in contrast to both a "line up" and a photo array procedure, both of which involve the witness viewing persons or photographs and, if able, picking one out as the offender. Generally speaking, the latter procedures, conducted properly, tend to be less legally problematic than some "show up" procedures. However, the law allows "show ups" which are not so tainted such that they are "unduly suggestive" and thus susceptible to misidentifications. See, generally, State v. Williams (1995), 73 Ohio St.3d 153, 163, citing Neil v. Biggers (1972),409 U.S. 188, 199-200.
This case exemplifies the potentially "unduly suggestive" nature of a "show up" procedure which, under other circumstances, might lend credence to a claim of misidentification. The procedure used by police in this case, however pragmatic and/or well-intentioned, was not a "textbook example" of a reliable "show up" identification. Although the testimony among the officers involved conflicts in some respects, the worst-case scenario here developed thus: the victim, knowing police believed they might have "caught their man" at a nearby scene, was taken by police to that scene; appellant, the lone suspect to be viewed, was ordered out of the back of a cruiser — clearly in police custody — while the victim watched; and, inarguably most problematic, the stolen merchandise was in plain view right alongside appellant during the identification process. If the state's case depended exclusively upon this "show up" identification, the outcome of this appeal might well be different.
We agree with defense counsel that during the suppression hearing detailed above, and during trial before the jury, the victim identified with certainty only the stolen merchandise — the physical evidence, and not his assailant. As emphasized above, the trial judge himself took particular note of Mr. Schall's answer that it "would be debatable" in response to the prosecutor's asking whether Schall would have been able to identify appellant "if he didn't have the merchandise on him."
Notwithstanding the foregoing observations, we agree with the state that the trial court did not commit prejudicial error in this instance. The victim's in-court testimony was admissible.
While admissible, however, the testimony nonetheless was subject to challenge as a matter of weight and credibility for the jury's resolution, as alluded to by the trial judge in his observation of the conflicting testimony. During cross-examination, defense counsel's questions elicited answers from Mr. Schall which potentially cast serious doubt upon the persuasiveness of his identification of appellant as the assailant. In the same vein, the police officers who conducted the "show up" were also subject to vigorous cross-examination. Ultimately, such credibility determinations are properly within the province of the jury as the factfinder.
Prior to deliberations, the trial court provided the jurors with the appropriate general instructions with respect to the jurors' obligations and options to weigh the credibility of each witness as each respective juror deemed fit. Simply put, the jury, by its verdict, chose to believe the prosecution witnesses.
Given the state of this record in its entirety, we cannot say that the trial court committed prejudicial error in allowing appellant's in-court "identification" of appellant as the man who restrained and robbed him. We reiterate our observation that the victim, during both the suppression hearing and at trial, instead actually identified with any significant degree of certainty only his stolen merchandise. Defense counsel's cross-examination of the state's witnesses repeatedly clarified this point.
The second assignment of error is overruled.
Turning now to appellant's first assignment of error, he argues, essentially, that he was denied a fair trial as a result of ineffective assistance of counsel.
The well-established standards by which we are bound in reviewing such claims were promulgated by the United States Supreme Court in Strickland v. Washington (1984), 466 U.S. 668. In State v. Hartman (2001),93 Ohio St.3d 274, the Supreme Court of Ohio recently reiterated the firmly-rooted Strickland standard:
 * * * Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.
Appellant claims that his first attorney was "objectively deficient" because counsel stipulated to the admission of appellant's polygraph results, thereby "opening the door" for the state's witness, the polygraph examiner, to testify that appellant had failed the examination.
Appellate counsel characterizes the net effect of this polygraph evidence as "sealing [appellant's] fate." Further, he argues, the "outcome would have been different without the polygraph albatross around [a]ppellant's neck." While we agree that such polygraph evidence is potentially susceptible to being given undue weight by a jury, we cannot say this jury would have acquitted appellant in the absence of such evidence.
Appellant directs our attention to State v. Lascola (1988),61 Ohio App.3d 228, in which this court addressed the ineffectiveness of trial counsel in stipulating to the admission of a polygraph test. Appellant emphasizes that the Lascola court recognized that a defendant's counsel "must use utmost caution in determining whether to stipulate to the admissibility" of polygraph results. Id. at 235. (Emphasis added.) This general proposition is not disputed.
Notwithstanding that observation, however, Lascola is readily distinguishable from the instant case, particularly in that it involved the polygraph results of the prosecution's primary complaining witness, not the defendant. In Lascola, the defendant was tried for the alleged rape of his stepdaughter, the witness who underwent the polygraph to which defense counsel stipulated. In addition to her accusations of rape, bolstered by her polygraph results, the witness was permitted to testify at length about irrelevant, inflammatory accusations as to why she also believed he had murdered her mother some years before.
This court's discussion in Lascola actually bolsters the state's position here. The court stated:
 There is a difference between the defendant's stipulating to admission of his polygraph test and the defendant's stipulating that the complaining witness's polygraph test may be admitted. When a defendant agrees to undergo a polygraph test, presumably he knows whether he is telling the truth and is willing to assume the risk of error. It is completely within his knowledge and control whether to make the decision. Such is not the case with a witness, where defendant has no control or knowledge as to whether the witness believes that his testimony is truthful even though the defendant knows he is innocent. * * * [Id. at 234; emphasis added.]
We adhere to the same rationale and reject appellant's contention that his attorney's stipulation, a stipulation to which the record demonstrates that appellant willingly agreed if not insisted upon, amounted to deficient performance.
In State v. Souel (1978), 53 Ohio St.2d 123, applied by this court in Lascola, supra at 233, as the "leading case in Ohio on the admissibility of polygraph results," the Supreme Court of Ohio set forth several conditions which must be satisfied in order to "make the results of a polygraph test of the defendant admissible." The Souel syllabus reads:
 The results of a polygraphic examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment, provided that the following conditions are observed:
 (1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.
 (2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.
 (3) If the graphs and examiner's opinion are offered in evidence[,] the opposing party shall have the right to cross-examine the examiner respecting:
(a) the examiner's qualifications and training;
 (b) the conditions under which the test was administered;
 (c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and,
 (d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.
 (4) If such evidence is admitted[,] the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given.
The stipulation which bears the signatures of both counsel and appellant personally is in full accord with the conditions set forth in Souel. The document is clearly and carefully crafted. It unambiguously cautions against the potential ramifications of an accused's decision to take the test. Furthermore, as indicated above, defense counsel vigorously cross-examined the polygraph examiner, challenging all "matter[s] deemed pertinent" as contemplated by Souel, including "the limitations of and possibilities for error" in the examination process.
Under the circumstances of this case, we find that the admission into evidence of appellant's polygraph results was conducted in full compliance with Souel. Were we to deem "deficient" counsel's joining his client in this stipulation, such holding would be tantamount to negating all such stipulations. The consequence of such a finding would not only render such stipulations meaningless; it would potentially mandate a finding of "deficient performance per se" by any defense attorney who accedes to the stipulation at the behest of his client.
Appellant also relies upon paragraph four of the syllabus to Souel in support of his final argument that his counsel was further ineffective in failing to request a specific limiting instruction to the jury regarding the appropriate "weight and effect" to be given to the polygraph testimony. We disagree.
Under the rigorous standards of Strickland, supra, we cannot conclude that the outcome of appellant's trial would have been different but for counsel's failure to request a specific limiting instruction which identically mirrors the language of that portion of Seoul which states that a trial judge "* * * should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged * * *." Id., paragraph four of the syllabus. (Emphasis added.)
Preliminarily, we note that the language employed by that portion of the syllabus is not mandatory. Nevertheless, even if the Seoul court elected to use the mandatory "shall" instead of "should," the trial court's charge to the jury in this case substantially satisfied the cautionary intent of Seoul.
The trial court first provided the jury with a general charge which included, as further suggested in the same Seoul syllabus paragraph, the customary instruction that, as is the case with the testimony of witnesses generally, "* * * it is for the jurors to determine what weight and effect such testimony should be given." In addition, the trial court, unequivocally speaking to the polygraph testimony, did provide an instruction regarding "opinion" testimony which added particular emphasis to the jury's role as the lone factfinder. This jury was instructed that it "* * * must decide what weight, if any, should be given to the testimony of an expert." (Tr. 197; emphasis added.) The instructions given to this jury were more than sufficient to impart to the jury its role as the ultimate factfinder and the appropriate weight and credibility determinations encompassed within that fact-finding role.
Given the foregoing, the performance of appellant's counsel in not requesting a specific limiting instruction in no way amounted to deficient performance.
Finally, as alluded to infra, the state makes a significant observation regarding the polygraphist's testimony with which we concur. The record is clear that appellant has a criminal record, in the words of the trial judge, "* * * which is fairly substantial with some amount of violence involved * * *." That record includes various charges of, inter alia, burglary, robbery, and receiving stolen property. (Tr. 221.) Since this case involved crimes of a similar nature, defense counsel reasonably did not put appellant on the witness stand, thereby foreclosing the jury from learning appellant's record. Instead, appellant's full explanation of the incident was presented to the jury via the testimony of the polygraphist. In the absence of the polygraphist's testimony, the jury would not have heard appellant's side of the story. To that extent, therefore, appellant benefited from the polygraph testimony, while leaving his counsel able to cross-examine, fairly voraciously, the reliability of such tests in general and this examiner in particular.
Upon a thorough review of the record, we cannot conclude that appellant has demonstrated a deficient performance by either his pretrial or trial counsel; accordingly, appellant necessarily cannot satisfy the requisite resulting prejudice.
The first assignment of error is overruled.
Having overruled the assignments of error, the judgment of the trial court is affirmed.
Judgment affirmed.
LAZARUS and DESHLER, JJ., concur.
[1] The indictment and numerous other portions in the record reference the offense date as June 6, 2000. However, the testimony and evidence adduced at trial consistently designate the offense as June 9.
[2] During closing argument, defense counsel reasonably conceded that the jury could "find this fella guilty of theft" but "not guilty of kidnapping." (Tr. 187; emphasis added.)