[Cite as *In re A.K.*, 2015-Ohio-30.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE:   A.K.

:
:
:     C.A. CASE NO.   26199
:
:     T.C. NO. 2013-5613
:
:     (Civil Appeal from Common Pleas
:      Court, Juvenile Division)
:
:

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___9th___ day of _____January_____, 2015.

. . . . . . . . . .

TIFFANY C. ALLEN, Atty. Reg. No. 0089369, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Appellee

SHERYL TRZASKA, Atty. Reg. No. 0079915, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
      Attorney for Appellant

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1}  A.K. appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which adjudicated him to be a delinquent and found him responsible for the rape of a child.   The trial court committed A.K. to the Department of

Youth Services for a minimum of one year and up to his 21st birthday.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} In August 2013, the State filed a complaint alleging that A.K., then age 14, had raped a child, C.C., who was four years old at the time of the alleged offenses. The complaint contained four counts of rape, which were alleged to have occurred between May 1 and July 21, 2013.

{¶ 4} The facts underlying the charges were as follows.

{¶ 5} C.C. lived with his mother in Middletown during the week and visited his father in Dayton on the weekends. Father had at least one other, older son, Michael, who was also present on the weekends. During the period in question, Father's father (C.C.'s grandfather) lived with Father and sometimes supervised the children on the weekends while Father was working. Grandfather was an "ex-sex offender," according to Father. A.K. was a friend of Michael's older half- or step-brother, Tommy.

{¶ 6} In June 2013, Mother noticed that C.C. was engaging in what she believed to be sexual, inappropriate behavior, and he was making comments about "sucking on [his] P bird." "P bird" was the term that C.C. used to refer to his penis. When Mother questioned C.C. about these behaviors, he said that "the man in the red shirt that brought him candy and played with him, that's who did it." Mother did not know anyone who fit this description. Mother was concerned about these behaviors, and she and Father had at least two discussions about them.

{¶ 7} Father also began to observe C.C.'s sexual behaviors. When Father talked with C.C. about them, C.C. again referenced a man in a red shirt who gave him candy; additionally, C.C. referred to the man as a "dark man" or "black man" and stated

that the incident occurred in "Michael's clubhouse," which Father knew to be a barn on his (Father's) property. Based on C.C.'s description and Father's knowledge of the comings and goings at his house, Father believed that C.C. was referring to A.K.

{¶ 8} In late summer 2013, Father confronted A.K. near Father's home; C.C. was present at the time of the confrontation, but Father sent him a short distance away, where C.C. talked with Father's friend, Jeff, who was also present. According to Father, C.C. approached him while he was talking with A.K. and called A.K. a "bad man." According to A.K., Father called C.C. over to their conversation and said to C.C, "Is this the kid who did it?" C.C. responded, "Yes." A.K. testified that C.C. had not made the statement spontaneously.

{¶ 9} Also in late summer 2013, Mother reported the matter to Montgomery County Children Services and to the police.

{¶ 10} After the complaint was filed, the trial court held a hearing to determine whether C.C. was competent to testify and determined that he was not. The court stated, "[C.C.] had a very hard time communicating with me on issues that I would say are substantive. He can maintain a conversation with the Court, but I do not feel comfortable in his ability to understand the difference between what's true and what is false." The State then filed a motion to declare C.C. unavailable to testify and to allow the use of C.C.'s statements to others, pursuant to Evid.R. 807. After conducting a second hearing, the trial court granted the State's motion.

{¶ 11} An adjudicatory hearing was held on January 28, 2014, at which Mother, Father, a doctor who talked with and examined C.C. for signs of abuse, and A.K. testified. After the hearing, the court found A.K. responsible for one count of rape; the court

dismissed the other three counts due to insufficient evidence. A.K. was sentenced as described above. The court did not classify A.K. as a sex offender, having concluded that he committed the offense when he was 13 years old.

{¶ 12} A.K. appeals, raising three assignments of error.

{¶ 13} The first assignment of error states:

**The juvenile court erred when it found that the alleged victim's statements were subject to the hearsay exception set forth in Evid.R. 807.**

{¶ 14} A.K. contends that the trial court erred in concluding that C.C.'s statements to others about the alleged sexual abuse were admissible under Evid.R. 807 as an exception to the hearsay rule.

{¶ 15} Evid.R. 807 provides:

(A) An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid.R. 802 if all of the following apply:

(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 [availability of declarant immaterial] and 804 [declarant unavailable]. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability

of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.

(2) The child's testimony is not reasonably obtainable by the proponent of the statement.

(3) There is independent proof of the sexual act or act of physical violence.

(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

{¶ 16} As with other evidentiary matters, we review the trial court's determination that a child's statement is admissible under Evid.R. 807 for an abuse of discretion. *State v. Dever,* 64 Ohio St.3d 401, 414, 596 N.E.2d 436 (1992) (admitting a four-year-old alleged sexual abuse victim's statement to a physician identifying Defendant as her abuser under Evid.R. 803(4), the medical diagnosis or treatment exception to the hearsay

rule); *State v. Cressel*, 2d Dist. Montgomery No. 25979, 2014-Ohio-3353, ¶ 35. In the past, "innumerable Ohio cases have stated that an abuse of discretion 'means more than an error of law or judgment,' which incorrectly implies that a trial court may commit an error of law without abusing its discretion. *State v. Bowles,* 2d Dist. Montgomery No. 23037, 2010-Ohio-278, ¶ 15, citation omitted. To the contrary, '[n]o court -- not a trial court, not an appellate court, nor even a supreme court -- has the authority, within its discretion, to commit an error of law.' *Id.* at ¶ 26. The abuse-of-discretion standard is more accurately defined as ' " [a]n appellate court's standard for reviewing a decision that is asserted to be grossly unsound, unreasonable, illegal, or unsupported by the evidence." ' *Id.* at ¶ 18, quoting Black's Law Dictionary, Eighth Edition (2004), at 11." *State v. Beverly*, 2d Dist. Clark No. 2011 CA 64, 2013-Ohio-1365, ¶ 52.

{¶ 17} A.K. does not dispute that C.C. was unavailable (Evid.R. 807(A)(2)) or that proper notice was given of the statements' content and circumstances (Evid.R. 807(A)(4)). However, A.K. contends that the trial court erred in concluding that C.C.'s statements had sufficient indicia of trustworthiness (Evid.R. 807(A)(1)) and that there was independent proof of the sexual act (Evid.R. 807(A)(3)). In particular, A.K. asserts that the trial court's finding that C.C. was incompetent was inconsistent and incompatible with its finding that his statements were trustworthy and reliable. In other words, A.K. contends that, having found C.C. incompetent to testify, the court could not have reasonably concluded that C.C.'s statements were "so free of the risk of inaccuracy and untrustworthiness * * * that the test of cross-examination would be superfluous" (citing *State v. Cocherl*, 2d Dist. Darke No. 1594, 2003-Ohio-3239, at ¶ 15).

{¶ 18} There can be no dispute but that the testimony of young children presents

vital and serious concerns for the rule of law and the fact finder. *See, e.g.*, Mosteller, *Remaking Confrontation Clause and Hearsay Doctrine Under the Challenge of Child Sexual Abuse Prosecutions*, 1993 U.Ill.L.Rev. 691 (1993). In this regard, the Ohio Supreme Court's view of the interplay between Evid.R. 807, competency, and the admissibility of a child-victim's out-of-court statement has evolved over time.[1] In *State v. Said*, 71 Ohio St.3d 473, 644 N.E.2d 337 (1994), the court held that a trial court was required to find that a child was competent at the time he made an out-of-court statement in order to admit the child's statement under Evid.R. 807. *Id.* at 477.

{¶ 19} However, in 2009, the supreme court rejected its prior holding, stating that the majority in *Said* had "sweepingly declared, without any authority" that Evid.R. 807 required a finding that the child was competent at the time he made the out-of-court statement. *State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, 906 N.E.2d 427, ¶ 15. The *Silverman* court observed that any requirement that the child declarant be determined to be competent to testify before a statement may be admitted was "notably absent" from Evid.R. 807. *Id.* at ¶ 14. "We now hold that the better approach is to return to the plain text of Evid.R. 807. The rule says absolutely nothing about a child declarant's competence." *Id.* at ¶ 20.

{¶ 20} In so holding, *Silverman* discussed several holdings from the supreme courts of other states and embraced their views that "a finding of incompetence 'does not make the [child's] hearsay statements unreliable'" and that it is a "'flawed assumption that a determination of incompetency at the time of the hearing invariably establishes that the

---

[1] The Ohio Supreme Court's view may evolve further. We note that the U.S. Supreme Court has granted certiorari in *State v. Clark*, 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592, a case potentially implicating the confrontation clause where a third party testifies about a child's statements. *Ohio v. Clark*, 135 S.Ct. 43, 189 L.Ed.2d 896 (2014).

child's statement was not reliable.'" *Id.* at ¶ 21-26, citing *Washington v. C.J.,* 148 Wash.2d 672, 63 P.3d 765 (2003) and *Colorado v. Dist. Court of El Paso Cty.*, 776 P.2d 1083, 1088 (Colo.1989). *Silverman* rejected the "dicta" in *Said* "that judicially grafted a competence requirement onto Evid.R. 807" and focused on the "host of factors" set forth in Evid.R. 807(A) to determine whether the child's out-of-court statement was reliable. *Id.* at ¶ 26-27.

{¶ 21} It would not be frivolous to argue that the Supreme Court's references to the holdings in other states that a finding of incompetency does not per se render a hearsay statement inadmissible are dicta, given the court's one-sentence "conclusion" that "a hearsay statement of a child declarant can be admitted under Evid.R. 807 without a determination of the child's competency to testify." *Silverman* at ¶ 34. *Silverman*, thus construed, would not be binding precedent as to whether an affirmative finding of incompetence is the same as no determination – either way -- of competency. However, such a strained interpretation of *Silverman* is not justified when the case is read as a whole.

{¶ 22} This interpretation is also supported by the subsequent holding in *Clark,* 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592*,* that a three-year-old's statement to a teacher was testimonial; *Clark* did not discuss Evid.R. 807, despite the trial court's determination of the child's incompetency. *Id.* at ¶ 36. Implicitly, the *Clark* majority would have the trial court engage in an Evid.R. 807 analysis, but-for the confrontation clause issue, i.e., if the trial court's finding of incompetency would automatically exclude the three-year-old's out-of-court hearsay statement, there was no reason to discuss to whom and under what conditions the statement was made.

{¶ 23} The trial court therefore acted in accordance with *Silverman* in recognizing that its determination with respect to C.C.'s competence did not end the inquiry into the admissibility of C.C.'s statements and in looking at the totality of the circumstances surrounding the making of the statements to determine their reliability and, thus, their admissibility. The finding of incompetency in this case did not require the trial court to also conclude that C.C.'s statements were untrustworthy.[2]

{¶ 24} At the competency hearing in this case, C.C. was sometimes confused and could not answer some of the judge's questions, such as his birthdate. However, he was able to tell the judge his age, that he would be going to school soon, the composition of his family, and some things for which he might get "in trouble" at home. There were some points at which C.C.'s answers seemed unrelated to the question that he was asked. At other points, the level of communication between C.C. and the judge is difficult to ascertain from the transcript; the judge seems to have been using props, such as a basketball and a hat, while questioning C.C., and it is unclear to us from the record whether C.C. was identifying the items correctly.

{¶ 25} At the hearing on the use of C.C.'s statements, C.C.'s mother, father, and Dr. Lori Vavul-Roediger of the Department of Child Advocacy at Dayton Children's Medical Center testified that C.C. had told them that someone had "sucked [his] P bird" with his mouth. (Again, "P bird" was the word C.C. used to refer to his penis.) During

---

[2] *Cocherl*'s suggestion that cross-examination of a child-victim must be allowed unless the child's statements are "so free of risk of inaccuracy and untrustworthiness * * * that the test of cross-examination would be superfluous," has not been adopted or followed by this court or any other court since *Cocherl* was decided in 2003 (pre-*Silverman*), and that language is not contained in the Rule. The relevant finding, as stated in Evid.R. 807(A)(1), is whether "the test of cross-examination would add little to the reliability of the statement."

his conversation with Dr. Vavul-Roediger, C.C. gestured toward his genitals when he made this statement. In his initial conversation with his mother, C.C. described the perpetrator as "the man in the red shirt that brought [me] candy and played with [me], that's who did it." C.C. also reported to Father that the "dark man" or "black man" with the red shirt, who came to Father's house and gave C.C. candy, was the man who had touched "P bird" and put it in his mouth. In his discussion with Dr. Vavul-Roediger, which occurred after a confrontation between A.K. and C.C.'s father (at which C.C. was present), C.C. referred to the perpetrator as "that black guy"; C.C. did not know A.K.'s name and urged Father to tell the doctor the man's name.

{¶ 26} The trial court noted that C.C.'s statements about the abuse were made in a relatively narrow timeframe (mid-June through August 2013), and that none of the testimony suggested that the statements had been fabricated or forced. The trial court could have reasonably concluded that C.C. had not fabricated these statements and that the statements were consistent with respect to their key elements. The trial court found that C.C.'s statements and the circumstances under which they were made, as recounted by all three State's witnesses, were sufficiently "spontaneous," "consistent," and "truthful" to conclude that the statements were trustworthy. We cannot conclude that the trial court erred or abused its discretion in reaching this conclusion.

{¶ 27} In his argument challenging the trial court's finding that C.C.'s statements were reliable, A.K. emphasizes that C.C.'s statements were not "spontaneous" because they were elicited during questioning by adults. Although questioning by an adult should be considered in the totality of the circumstances bearing on the trustworthiness of a child's statements, it does not automatically render a child's statement unreliable or

untrustworthy. We have previously observed that "it is understandable that a child of tender years would be reluctant to talk about * * * a puzzling and traumatizing incident except in a question-and-answer format. With respect to the trustworthiness and reliability of [a child's] statements, we believe it is far more important that no one coached or prodded [the child] concerning what had happened to [him] and less important that [the child] had to be encouraged to talk about those events." *State v. Cardosi,* 122 Ohio App.3d 70, 76, 701 N.E.2d 44 (2d Dist.1997).

{¶ 28} A.K. also argues that there was no independent proof of the sexual act(s), as required by Evid.R. 807(A)(3). In concluding that this requirement had been met, the trial court relied on the behaviors that had aroused C.C.'s parents' suspicions of abuse in the summer of 2013. Mother testified that, in June 2013, C.C. began exhibiting behaviors that were "too sexual" for a four-year-old and that she had not previously seen. For example, he rubbed his penis on his grandmother's foot, "messed with" his penis himself, and stated "suck my P bird." Father also reported that C.C. began "grab[bing] his private area" and saying "suck my P bird" in June 2013, which were behaviors he had never previously exhibited.

{¶ 29} The trial court concluded that the onset of these behaviors was not "normal" for a four-year-old and that they provided independent proof that a sexual act involving C.C. had occurred, notwithstanding the absence of physical evidence. As the trial court pointed out, Evid.R. 807 requires independent proof of the occurrence of a sexual act; it does not require independent proof of *the identity* of the perpetrator. The trial court did not abuse its discretion in concluding that the onset of sexually inappropriate and suggestive behavior constituted independent proof that C.C. had been abused. *See,*

*e.g., State v. Owens*, 2d Dist. Montgomery No. 17394, 2000 WL 217219 (Feb. 25, 2000) (holding that toddler's masturbation, statements about defendant touching her "pee pee" and butt, and graphic (but childish) descriptions of sexual conduct constituted "independent proof" of the sexual act).

{¶ 30} In his brief, A.K. additionally points out that Father played a significant role in the identification of A.K. as the perpetrator, that Father could not have known that A.K. was the only person C.C. had encountered who fit his description, and that Father's friend, Jeff, may have talked with and influenced C.C. before C.C. approached Father and A.K. and allegedly identified A.K. as the perpetrator.   The fact that the identification of A.K. by Father was circumstantial did not preclude the trial court from crediting it. Whether C.C. identified A.K. independently, and in a credible fashion, was also a factual determination for the trial court to make based on the evidence presented.   The trial court could have reasonably believed Father's testimony that A.K. was the only person with whom C.C. came into contact who fit C.C.'s description, independent of C.C.'s statements allegedly corroborating this identification.   Any suggestion that Father's friend influenced C.C. to identify A.K. as the perpetrator is speculative based on the evidence presented and, again, a matter to the weighed by the finder of fact.

{¶ 31} Again, the admission of out-of-court statements of an incompetent child is an area fraught with danger, but one in which the Ohio Supreme Court has recognized discretion on the part of the trial court.   We cannot find, as a matter of law, that the trial court abused its discretion or otherwise erred in its determinations.

{¶ 32} The first assignment of error is overruled.

{¶ 33} The second and third assignments of error state:

**[A.K.'s] adjudication for rape was supported by insufficient evidence.**

**[A.K.'s] adjudication for rape was against the manifest weight of the evidence.**

{¶ 34}  A.K. argues that the hearsay statements of an incompetent witness did not constitute competent evidence to support his conviction, and that C.C.'s identification of A.K. as the perpetrator was not credible.

{¶ 35}  A sufficiency-of-the-evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses.  *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.  "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 36}  In contrast, when reviewing a judgment under a manifest-weight standard of review, "'[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 37} The testimony offered by Mother, Father and Dr. Vavul-Roediger at trial was very similar to their testimony at the Evid.R. 807 hearing; they recounted how they had become concerned about C.C.'s behaviors, the inappropriate sexual behaviors that they had observed and comments they had heard, and C.C.'s description of the man who had "sucked [his] P bird." Father and A.K. also restated their conflicting accounts of the manner in which C.C. had confronted and identified A.K. when Father was talking with A.K.

{¶ 38} In a few respects, the testimony offered at trial expanded upon the testimony offered at the prior hearing. In addition to her testimony that C.C.'s physical exam had revealed no signs of sexual abuse, Dr. Vavul-Roediger testified at trial that such an absence of physical signs was typical of cases involving an allegation of one's mouth coming in contact with another's penis. Mother testified that, in addition to the physical description C.C. had given about the person who had touched his genitals, C.C. had stated that he (C.C.) had played with this person at his father's and grandfather's house.

{¶ 39} Father was questioned at some length about his father, C.C.'s grandfather, who lived with Father during the summer of 2013 and moved out of state in August 2013. (Father had previously testified that Grandfather was an "ex-sex offender.") Father

testified that Grandfather had been in treatment for renal cancer and had been recuperating from the removal of one of his kidneys in the summer of 2013. Father acknowledged that Grandfather was "a lousy babysitter" as far as monitoring the children's activities when Father was at work. Father did not indicate any concern that Grandfather had abused C.C., but he was not asked this question directly; Grandfather had had regular contact with C.C. prior to the summer of 2013.

{¶ 40} Father testified that A.K. came over to play with his son Michael's older brother, Tommy (apparently a step- or half-brother who was not related to Father). Father had seen A.K. at the house several times, including approximately three times when Michael and C.C. were there and A.K. was playing with them. Prior to C.C.'s statements to Mother and Father about the man in the red shirt who provided him with candy, Father had questioned C.C. about the source of some candy in C.C.'s possession; C.C. had indicated that it came from A.K. Father observed that the only person with whom C.C. came into contact at his house who fit C.C.'s description of the person who had "sucked [his] P bird" – including the provision of candy, the skin color, the red shirt, and the "playing" with C.C. – was A.K. Father testified that, when he confronted A.K., A.K. had denied touching C.C., but had kept his head down and had not looked Father in the eye.

{¶ 41} A.K. testified that he never played with C.C., but that he once played basketball with Father. A.K. testified that he only came to the house a few times to ask for jobs from Grandfather, for which he had been paid. A.K. denied that he had ever given C.C. candy or played with him alone. He claimed that he had only seen the kids on one occasion, when they had watched him working in the yard from the window of the

house.

**{¶ 42}** Although the evidence was circumstantial and relied, in part, on C.C.'s statements, the trial court could have reasonably concluded that A.K. was guilty beyond a reasonable doubt. The trial court did not clearly lose its way and create a manifest miscarriage of justice in reaching the conclusion that it did. Accordingly, A.K.'s adjudication was neither supported by insufficient evidence nor against the manifest weight of the evidence.

**{¶ 43}** The second and third assignments of error are overruled.

**{¶ 44}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Tiffany C. Allen
Sheryl Trzaska
Hon. Anthony Capizzi