[Cite as *In re S.H.W.*, 2016-Ohio-841.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

IN THE MATTER OF:  S.H.W.

:
:
:  C.A. CASE NO. 2015-CA-25
:
:  T.C. NO. D44918
:
:  (Civil appeal from Common
:   Pleas Court, Juvenile Division)
:
:

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___4th___ day of _____March_____, 2016.

. . . . . . . . . .

NATHANIEL R. LUKEN, Atty, Reg. No. 0087864, Assistant Prosecutor, 61 Greene Street, Xenia, Ohio 45385
        Attorney for Plaintiff-Appellee

MICHAEL T. COLUMBUS, Atty. Reg. No. 0076799, 130 W. Second Street, Suite 2103, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} Juvenile-appellant S.H.W. appeals his adjudication of delinquency for one count of rape, in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree if committed by an adult; and two counts of gross sexual imposition (GSI), in violation of R.C. 2907.05(A)(4), both felonies of the third degree if committed by an adult.   S.H.W. filed a

timely notice of appeal with this Court on April 23, 2015.

{¶ 2} The events which form the basis for the instant appeal occurred on or about the evening of May 14, 2013, when S.H.W. was babysitting the victim, D.R. At the time of the sexual assault, S.H.W. was fourteen years old and D.R. was five years old. D.R.'s mother, M.R., had asked S.H.W. to watch D.R. at 7:30 p.m. while she worked out for approximately thirty minutes. S.H.W. told M.R. that he was going to take D.R. to Mills Lawn Park which was located directly across the street from the house where M.R. lived with D.R. We also note that D.R. attended Mills Lawn Park Elementary School, which is located in the center of Mills Lawn Park in Yellow Springs, Ohio.

{¶ 3} At approximately 7:30 p.m., S.H.W. arrived at M.R.'s house, and he and D.R. walked across the street to Mills Lawn Park. M.R. walked over to where S.H.W. and D.R. were playing, handed them a Frisbee, and went back home to do her work out routine. M.R. testified that she worked out for approximately fifteen minutes before she decided to go check on D.R. because it was the first time that S.H.W. babysat him alone without the assistance of his sister, S.W. M.R. walked to the grassy area where she had left the boys, but she did not see them. M.R. began walking down the street looking for S.H.W. and D.R. M.R. testified that she encountered S.W. who was going for a walk and asked her for help in locating the two boys. M.R. and S.W. searched for the boys for approximately seven to ten minutes but did not find them. M.R. testified that she specifically looked for the boys at the sand box and the green monkey bars located in the park. M.R. went back to her house and waited for another five to ten minutes before walking back over to the park to look for the boys. At that point, M.R. found S.H.W. and D.R. playing in the sandbox.

{¶ 4} When M.R. asked the boys where they had been, S.H.W. answered that they had been playing at the green monkey bars. M.R., D.R., and S.H.W. then walked back to M.R.'s house and ate dinner. M.R. paid S.H.W. for babysitting D.R., and he left. S.H.W., however, returned to M.R.'s residence a short time later, requesting to be paid. M.R. testified that she reminded him that he had been paid, and he left again.

{¶ 5} Later that night, M.R. testified that she was giving D.R. a bath. M.R. observed that his penis was "extremely erect," and that was something that she had never witnessed before. Furthermore, when she wiped D.R.'s bottom after a bowel movement, M.R. observed that there was blood on the toilet paper. M.R. testified that D.R. told her that "it hurt to poop." M.R. testified that D.R. also seemed lethargic and acted as if something was troubling him. M.R. testified that D.R. went to sleep almost immediately that night which was unusual for him. M.R. testified that over the next few days, D.R. was very temperamental and distant. On May 16, 2013, M.R. testified that she observed D.R. laying on her bed stroking his penis. When M.R. asked him what he was doing, D.R. stated, "[m]y penis is a groundhog, it goes into the hole," and "my penis is a turtle." M.R. asked him where he had heard that, but D.R. did not mention S.H.W.

{¶ 6} M.R. testified that she and D.R. went camping from May 17, 2013, until May 19, 2013. M.R. testified that D.R. seemed distant during the trip. When they returned on the evening of Sunday, May 19, 2013, M.R. testified that D.R. informed her that he was "going to put his penis in her butt." M.R. asked him where he heard that because she had never heard him say anything like that before. In response, D.R. asked M.R. "if he told her, would she forget." D.R. proceeded to tell her that S.H.W. had taken him to a library bathroom, and he made D.R. touch his penis. S.H.W. then touched D.R.'s

penis.   Thereafter, S.H.W. put his finger and then his penis into D.R.'s bottom.   D.R. told M.R. that S.H.W. threatened to kill him if he told anybody what happened.   D.R. also told M.R. that S.H.W. choked him, smacked him on the head a few times, and called him names.

{¶ 7} On May 20, 2013, M.R. called the Yellow Springs Police Department, and spoke to Detective Naomi Penrod who arranged to conduct a forensic interview of D.R. at Michael's House, an advocacy center for abused and neglected children.   D.R. was subsequently interviewed by Cynthia Gevedon.   Det. Penrod testified that as a result of the disclosures made by D.R. during the interview, she made contact with S.H.W. and his mother, L.H.   Det. Penrod informed S.H.W. that D.R. had accused him of sexually abusing him in the Yellow Springs Library on May 14, 2013.   S.H.W. denied the accusations and offered to take a polygraph test.

{¶ 8} On May 29, 2013, S.H.W. was charged by complaint with one count of rape and two counts of GSI.   At a detention and plea hearing held on May 30, 2013, S.H.W., represented by counsel, entered a denial to the offenses in the complaint and was remanded into the custody of the Greene County Juvenile Detention Center.   While in custody, S.H.W. submitted to a polygraph examination which was conducted on June 27, 2013.   The parties stipulated to the use of the results of the polygraph examination at trial and the right to cross-examine the examiner.

{¶ 9} On July 17, 2013, S.H.W. filed a motion requesting the following: 1) his release from detention; 2) the results of his polygraph examination; and 3) discovery of the video surveillance recordings from the Yellow Springs Library on the day that the sexual assault was alleged to have occurred.   The State filed the results of the polygraph

examination on the same day. We note that the results of the examination indicated that S.H.W. was being untruthful when he denied sexually assaulting D.R. on the day in question. On July 29, 2013, the magistrate denied S.H.W.'s motion for release from detention and ordered a voir dire examination in order to determine D.R.'s competency to testify at trial. On August 5, 2013, S.H.W. filed a motion to dismiss the complaint, arguing that the State knowingly withheld exculpatory evidence, to wit: the surveillance tapes from the Yellow Springs Library from the day in question. S.H.W. also renewed his request for release from detention.

{¶ 10} On September 3, 2013, the magistrate conducted a competency hearing for D.R. On September 10, 2013, the magistrate issued a decision in which it found D.R. competent to testify. The magistrate also ordered that S.H.W. be released from detention and denied his motion to dismiss. On September 11, 2013, S.H.W. filed objections to the magistrate's decision which found D.R. competent to testify. Based upon a stipulation entered into by both parties, the trial court sustained S.H.W.'s objections to the magistrate's decision and found that D.R. was not competent to testify.

{¶ 11} On November 15, 2013, the State filed a motion in limine in order to determine the admissibility of hearsay statements made by D.R. to his mother and to two forensic psychologists who interviewed him regarding the sexual assault perpetrated by S.H.W. In a decision issued on January 2, 2014, the trial court found that D.R.'s statements to his mother were admissible as excited utterances pursuant to Evid.R. 803(2). The trial court also found that D.R.'s statements made to the forensic psychologists were preliminarily admissible as statements for purposes of medical diagnosis or treatment pursuant to Evid.R. 803(4) and as a child statement in an abuse

case under Evid.R. 807. The trial court stated that its ultimate judgment regarding the admissibility of D.R.'s statements under Evid.R 807 would be determined by the doctors' testimony with respect to whether the presence of blood on D.R.'s toilet paper and his sexualized behavior could serve as independent proof of the sexual assault. Moreover, the admissibility of statements made by D.R. to the doctors regarding S.H.W.'s identity would be determined by whether their testimony established that those statements were necessary for diagnosis and/or treatment. Evid.R 803(4).

{¶ 12} The hearing before the trial court was held over the following dates: January 8, 2014, January 22, 2014, and February 6, 2014. In light of the evidence presented at the hearing, the trial court adjudicated S.H.W. delinquent of all three offenses.[1] On March 25, 2015, the trial court imposed a commitment to the Ohio Department of Youth Services for a minimum period of one year for the rape offense and six months for each of the GSI offenses, the commitments to be served concurrently. The trial court also ordered S.H.W. to pay court costs and a fine for each offense. Finally, the trial court suspended all three commitments based on a number of conditions, including requirements that S.H.W. comply with the terms of probation and complete an appropriate sex offender therapy program.

{¶ 13} It is from this judgment that S.H.W. now appeals.

{¶ 14} S.H.W.'s first assignment of error is as follows:

{¶ 15} "THE JUVENILE COURT ERRED WHEN IT FOUND THAT THE ALLEGED VICTIM'S STATEMENTS WERE ADMISSIBLE PURSUANT TO THE HEARSAY

---

[1] Pursuant to Juv.R. 22(B), the trial court amended the GSI section of the complaint from R.C. 2907.05(A)(2) to R.C. 2907.05(A)(4).

EXCEPTION SET FORTH IN EVID.R. 803(2)."

{¶ 16} In his first assignment, S.H.W. contends that the trial court erred when it found that D.R.'s statements to his mother regarding the events and circumstances leading to the sexual assault were admissible as excited utterances pursuant to Evid.R. 803(2). Specifically, S.H.W. argues that D.R.'s statements to M.R. do not fall under the excited utterance exception to the hearsay rule because the statements were made after extensive questioning by M.R., and were therefore not made spontaneously, but rather after reflective thought.

{¶ 17} Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible, except as provided by the U.S. or Ohio Constitutions, by statute or court rule. Evid.R. 802. We review a trial court's evidentiary rulings for an abuse of discretion, provided an objection is made at trial. *State v. Cunningham,* 2d Dist. Clark No. 11CA 0032, 2012–Ohio–2333, ¶ 22.

{¶ 18} "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.,* 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

{¶ 19} A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo,* would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary

result. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment, Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 20} Pursuant to Evid.R. 803(2), an excited utterance is an exception to the hearsay rule. In *State v. Abner,* 2d Dist. Montgomery No. 20661, 2006–Ohio–4510 at ¶ 69, we observed:

> An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event. *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993).

{¶ 21} In *Taylor,* the Ohio Supreme Court elaborated on the proper scope of appellate review of a trial court's decision to admit or reject a hearsay exception like an excited utterance:

> "There may be instances in which a decision to reject such a declaration will appear to a reviewing court almost as reasonable as a decision to admit it; and vice versa. We certainly do not believe that the decision of the trial judge in such an instance should be disturbed.
> * * * [T]he trial judge, in determining whether this declaration was admissible, necessarily had to decide certain questions of fact. If his

decision of those questions of fact, as reflected in his ruling on the admissibility of this declaration, was a reasonable decision, an appellate court should not disturb it. In other words, we believe that the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision. * * * "

*Taylor,* 66 Ohio St.3d at 304–305, 612 N.E.2d 316, quoting *Potter v. Baker,* 162 Ohio St. 488, 499–500, 124 N.E.2d 140 (1955).

{¶ 22} The excited utterance exception to the hearsay rule should be applied liberally in a case involving the sexual abuse of a young child. *State v. Boston*, 46 Ohio St.3d 108, 118, 545 N.E.2d 1220 (1989). This is based upon the age of the child, the shocking nature of the act, and the surprising nature of the assault. *Id.*

{¶ 23} The passage of time between the event and the child's out-of-court statement, while obviously a factor, is not dispositive. Even when the statement is made after a substantial lapse of time, it may be admitted under the excited-utterance exception. *Taylor*, 66 Ohio St.3d 295, 303-304 (1993). Where a young child claims to have been the victim of a sexual assault, the test for admission of the child's statements does not focus upon the progression of the startling event or occurrence, but upon the spontaneous nature of the child's statement. *State v. Huntley*, 2d Dist. Montgomery No. 23545, 2010-Ohio-6102, ¶ 35. Children are likely to remain in a state of nervous excitement longer than would an adult, and therefore it has been held that admission of statements of a child

regarding sexual assault may be proper under the excited utterance exception even when they are made after a substantial lapse of time. *Taylor*, 66 Ohio St.3d 295, 304 (1993). The Ohio Supreme Court also held in *Taylor* that there is no per se amount of time after which a statement can no longer be considered to be an excited utterance; the central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought. *Id.*

{¶ 24} Upon review, we agree with the trial court and find that D.R.'s statements to his mother were not the product of leading and/or coercive questioning on the part of M.R. Significantly, the record establishes that the following statements made by D.R. to his mother were spontaneous and not the result of any type of questioning: 1) "my penis is a turtle, it goes in and out of its shell;" 2) "my penis is a groundhog, it goes into the hole;" and 3) "I'm going to put my penis in your butt." All three of the statements made by D.R. related to a startling event, were spontaneously uttered, and regarded a subject matter ordinarily foreign to a young child. Moreover, upon hearing D.R. state that he was "going to put [his] penis in [her] butt," M.R. simply asked the child where he had previously heard that phrase because he had never said anything like that before. D.R. responded by asking M.R., "if I tell you, will you forget?" When M.R. responded by reassuring him that she would, in fact, "forget," D.R. told her what S.H.W. had done to him. M.R. did not ask D.R. any leading questions, nor does the record establish that she coerced D.R. into telling her about the sexual assault committed by S.H.W.

{¶ 25} M.R. further testified that in the days after the sexual assault occurred and before he informed her of the incident, D.R. was acting "defeated" and as if "something was troubling him." M.R. testified that D.R., who was usually very bright and energetic,

acted very angry and emotionally volatile, stating that he "hated [him]self" on at least one occasion. M.R. testified that during a trip to the zoo in the following week after the assault occurred, D.R. stated that he wanted to run out in front of a train that ran around the property and kill himself. Coupled with his emotionally volatile behavior, D.R.'s request that M.R. "forget if he told what happened" establishes that he was still under the stress of the shocking event when he made the statements to his mother. Accordingly, neither M.R.'s non-coercive follow-up questions, nor the passage of approximately five days, destroyed the spontaneity and nervous excitement of D.R.'s statements regarding the event. Thus, the trial court did not err when it admitted D.R.'s statements to M.R. as excited utterances pursuant to Evid.R. 803(2).

{¶ 26} S.H.W.'s first assignment of error is overruled.

{¶ 27} S.H.W.'s second assignment of error is as follows:

{¶ 28} "THE JUVENILE COURT ERRED WHEN IT FOUND THAT THE ALLEGED VICTIM'S STATEMENTS WERE ADMISSIBLE PURSUANT TO THE HEARSAY EXCEPTION SET FORTH IN EVIDENCE RULE 807."

{¶ 29} In his second assignment, S.H.W. argues that the trial court erred when it admitted D.R.'s hearsay statements regarding the sexual abuse he suffered pursuant to Evid.R. 807. Specifically, S.H.W. argues that D.R.'s statements regarding the sexual abuse lacked sufficient indicia of trustworthiness and independent corroboration of the abuse. S.H.W. also asserts that the trial court's finding that D.R. was incompetent to testify was inconsistent and incompatible with its finding that his statements were trustworthy and reliable.

{¶ 30} Evid.R. 807 provides:

(A) An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid.R. 802 if all of the following apply:

(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 [availability of declarant immaterial] and 804 [declarant unavailable]. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.

2) The child's testimony is not reasonably obtainable by the proponent of the statement.

(3) There is independent proof of the sexual act or act of physical violence.

(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

{¶ 31} As with other evidentiary matters, we review the trial court's determination that a child's statement is admissible under Evid.R.807 for an abuse of discretion. *In Re: A.K.*, 2d Dist. Montgomery No. 26199, 2015-Ohio-30, ¶ 16 (admitting a four-year-old alleged sexual abuse victim's statements to his mother, father, and treating physician identifying the defendant as his abuser under Evid.R. 807). We note that S.H.W. does not dispute that D.R. was unavailable (Evid.R. 807(A)(2)) or that proper notice was given of the statements' content and circumstances (Evid.R. 807(A)(4)). However, S.H.W. contends that the trial court erred in concluding that D.R.'s statements had sufficient indicia of trustworthiness (Evid.R. 807(A)(1)) and that there was independent proof of the sexual act(s) (Evid.R. 807(A)(3)).

{¶ 32} In *In Re: A.K.*, 2d Dist. Montgomery No. 26199, 2015-Ohio-30, we recently addressed the trial court's admission of a four-year old's statements under Evid.R. 807 after the child had been deemed incompetent to testify at trial:

There can be no dispute but that the testimony of young children presents vital and serious concerns for the rule of law and the fact finder. *See, e.g.,* Mosteller, *Remaking Confrontation Clause and Hearsay Doctrine Under the Challenge of Child Sexual Abuse Prosecutions,* 1993

U.Ill.L.Rev. 691 (1993). In this regard, the Ohio Supreme Court's view of the interplay between Evid.R. 807, competency, and the admissibility of a child-victim's out-of-court statement has evolved over time. In *State v. Said,* 71 Ohio St.3d 473, 644 N.E.2d 337 (1994), the court held that a trial court was required to find that a child was competent at the time he made an out-of-court statement in order to admit the child's statement under Evid.R. 807. *Id.* at 477.

However, in 2009, the supreme court rejected its prior holding, stating that the majority in *Said* had "sweepingly declared, without any authority" that Evid.R. 807 required a finding that the child was competent at the time he made the out-of-court statement. *State v. Silverman,* 121 Ohio St.3d 581, 2009–Ohio–1576, 906 N.E.2d 427, ¶ 15. The *Silverman* court observed that any requirement that the child declarant be determined to be competent to testify before a statement may be admitted was "notably absent" from Evid.R. 807. *Id.* at ¶ 14. "We now hold that the better approach is to return to the plain text of Evid.R. 807. The rule says absolutely nothing about a child declarant's competence." *Id.* at ¶ 20.

In so holding, *Silverman* discussed several holdings from the supreme courts of other states and embraced their views that "a finding of incompetence 'does not make the [child's] hearsay statements unreliable' " and that it is a " 'flawed assumption that a determination of incompetency at the time of the hearing invariably establishes that the child's statement was not reliable.' " *Id.* at ¶ 21–26, citing *Washington v. C.J.,* 148 Wash.2d

672, 63 P.3d 765 (2003) and *Colorado v. Dist. Court of El Paso Cty.,* 776 P.2d 1083, 1088 (Colo.1989). *Silverman* rejected the "dicta" in *Said* "that judicially grafted a competence requirement onto Evid.R. 807" and focused on the "host of factors" set forth in Evid.R. 807(A) to determine whether the child's out-of-court statement was reliable. *Id.* at ¶ 26–27.

It would not be frivolous to argue that the Supreme Court's references to the holdings in other states that a finding of incompetency does not per se render a hearsay statement inadmissible are dicta, given the court's one-sentence "conclusion" that "a hearsay statement of a child declarant can be admitted under Evid.R. 807 without a determination of the child's competency to testify." *Silverman* at ¶ 34. *Silverman,* thus construed, would not be binding precedent as to whether an affirmative finding of incompetence is the same as no determination—either way—of competency. However, such a strained interpretation of *Silverman* is not justified when the case is read as a whole.

*In Re:  A.K.,* ¶s 18-21.

{¶ 33} In the instant case, the trial court acted in accordance with *Silverman* in recognizing that its determination with respect to D.R.'s competence did not end the inquiry into the admissibility of his statements and in looking at the totality of the circumstances surrounding the making of the statements to determine their reliability and, thus, their admissibility. The parties' stipulation to D.R.'s incompetency to testify in this case did not require the trial court to also conclude that his statements to his mother and treating physicians were untrustworthy.

{¶ 34} As previously stated, the State filed a motion in limine in order to determine the admissibility of hearsay statements made by D.R. to his mother and to two forensic psychologists who interviewed him regarding the sexual assault perpetrated by S.H.W. In regards to the admissibility of D.R.'s statements under Evid.R. 807, the trial court stated the following:

> The Court finds that three of the four prerequisites under Evidence Rule 807-(1), (2), and (4) – have been met. Based upon the spontaneity of D.R.'s statements, their internal consistency, the lack of a motive for D.R. to fabricate, the use of terminology unexpected for a child D.R.'s age, and the alleged sexual assault being the only source of D.R.'s awareness of said terminology, the Court finds that the statements are trustworthy and as least as reliable as statements admitted pursuant to Evid.R. 803 and 804. Whether there is independent proof of the sexual act will hinge of [sic] the Court's finding after hearing the opinions of Dr. Roediger and/or Dr. Guadalupe related to the blood on the toilet tissue and D.R.'s alleged sexualized behavior.

{¶ 35} S.H.W. argues that D.R.'s statements were not "spontaneous" because they were elicited during questioning by adults, namely M.R. who was already negatively predisposed towards S.H.W. Although questioning by an adult should be considered in the totality of the circumstances bearing on the trustworthiness of a child's statements, it does not automatically render a child's statement unreliable or untrustworthy. We have previously found that "it is understandable that a child of tender years would be reluctant to talk about * * * a puzzling and traumatizing incident except in a question-and-answer

format. With respect to the trustworthiness and reliability of [a child's] statements, we believe it is far more important that no one coached or prodded [the child] concerning what had happened to [him] and less important that [the child] had to be encouraged to talk about those events." *State v. Cardosi,* 122 Ohio App.3d 70, 76, 701 N.E.2d 44 (2d Dist.1997).

{¶ 36} As we stated in the first assignment, D.R. was not prodded or coerced into disclosing the sexual abuse he suffered from S.H.W. M.R. simply asked D.R. where he had heard about putting his "penis in her butt." M.R. did not implicate S.H.W. in any way before being told by D.R. of the sexual abuse. Additionally, Dr. Guadalupe testified that D.R. used age appropriate language and his story regarding the sexual abuse was consistent over time. While the terminology D.R. used was age appropriate, Dr. Guadalupe testified that D.R. should not have been aware of the concepts and sexual acts that he described. Moreover, D.R. had no discernible motive to fabricate the incident. M.R. testified that prior to the sexual abuse, D.R. stated that he liked S.H.W. Both Drs. Roediger and Guadalupe testified that D.R.'s overall mental state and behavior following the incident was consistent with someone who had experienced sexual abuse. Accordingly, the trial court did not err when it found that D.R.'s statements had sufficient indicia of trustworthiness under Evid.R. 807(A)(1).

{¶ 37} S.H.W. also argues that there was no independent proof of the sexual act(s), as required by Evid.R. 807(A)(3). As previously noted, both Drs. Roediger and Guadalupe testified that D.R.'s behavior was consistent with a child who had been sexually abused. Among the symptoms exhibited by D.R. that were indicative of sexual abuse were anxiety, fear, sadness, anger, guilt, and blame. Dr. Guadalupe testified that

D.R. told her that he suffered from frequent nightmares and recurrent memories associated with the sexual abuse. Furthermore, when she wiped D.R.'s bottom after a bowel movement on the night of the incident, M.R. observed that there was blood on the toilet paper. M.R. testified that D.R. told her that "it hurt to poop."

{¶ 38} M.R. also testified that almost immediately after the abuse was alleged to have occurred, D.R. began exhibiting sexualized behavior that she had never observed until that point. Specifically, when she ran a bath for D.R. on the night after the incident, she observed that his penis was erect, something which had never occurred before. M.R. also observed that the once energetic D.R. seemed unusually tired and negative. On May 16, 2013, two nights after the incident occurred M.R. testified that she observed D.R. laying on her bed stroking his penis. When M.R. asked him what he was doing, D.R. stated, "[m]y penis is a groundhog, it goes into the hole," and "my penis is a turtle." Lastly, just before disclosing the sexual abuse to M.R., D.R. told her that he wanted to "put [his] penis in her butt." The trial court, therefore, did not abuse its discretion in concluding that the onset of sexually inappropriate and suggestive behavior constituted independent proof that D.R. had been abused. Accordingly, the trial court did not err when it admitted D.R.'s hearsay statements regarding the sexual abuse he suffered pursuant to Evid.R. 807.

{¶ 39} S.H.W.'s second assignment of error is overruled.

{¶ 40} S.H.W.'s third assignment of error is as follows:

{¶ 41} "THE JUVENILE COURT ERRED WHEN IT FOUND THAT THE ALLEGED VICTIM'S STATEMENTS WERE SUBJECT TO THE HEARSAY EXCEPTION SET FORTH IN EVID.R. 803(4)."

{¶ 42} In his third assignment, S.H.W. argues that the trial court erred when it admitted D.R.'s statements to his treating physicians with respect to the identity of the person who sexually abused him pursuant to Evid.R. 803(4). Specifically, S.H.W. contends that D.R.'s statements to Drs. Roediger and Guadalupe in which he identified S.H.W. as his abuser were not admissible as statements for the purpose of medical treatment under Evid.R. 803(4).

{¶ 43} Evid.R. 803(4) allows, as an exception to the hearsay rule, the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Thus, "[w]hen examining the admissibility of hearsay statements under Evid.R. 803(4), the primary inquiry is whether the statements were made for the purposes of medical diagnosis or treatment, as opposed to some other purpose." *State v. Hill*, 2d Dist. Montgomery No. 24410, 2011-Ohio-5810, ¶¶ 24-26. As stated by the Supreme Court of Ohio, "[t]he test under Evid.R. 803(4) goes solely to whether a statement was made for purposes of medical diagnosis or treatment. If a statement is made for purposes of diagnosis or treatment, it is admissible pursuant to Evid.R. 803(4)." *State v. Dever,* 64 Ohio St.3d 401, 414, 596 N.E.2d 436 (1992).

{¶ 44} "Statements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford* [*v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)] because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid." *State v. Muttart,* 116 Ohio St.3d 5, 2007–Ohio–5267, 875 N.E.2d 944, ¶ 63; *see also State v. Stahl,* 111 Ohio St.3d 186,

2006–Ohio–5428, 855 N.E.2d 834, ¶ 25. Statements of this kind are not testimonial in nature. Instead, they fall within a well-defined exception to the hearsay rule, that is, statements made for the purpose of medical diagnosis or treatment. Evid.R. 803(4). The exception allows the admission of statements made not only to licensed physicians, but also to psychologists and social workers, so long as the function of the person to whom the statement is made was diagnosis or treatment. *Hill*, 2d Dist. Montgomery No. 24410, 2011-Ohio-5810, ¶ 27. "A reviewing court will not reverse the trial court's admission of evidence absent an abuse of discretion." *State v. Bellomy,* 2d Dist. Montgomery No. 21452, 2006–Ohio–7087, ¶ 12.

{¶ 45} In *Muttart,* the defendant was convicted of raping a child under 13 years of age, and the Supreme Court of Ohio determined that the trial court did not abuse its discretion in admitting the victim's out of court statements to medical personnel pursuant to Evid.R. 803(4). *Id.*, 116 Ohio St.3d 5, 2007–Ohio–5267. The statements contained the perpetrator's identity. The *Muttart* court further determined that the victim's statements were not testimonial in nature and did not implicate the defendant's Sixth Amendment right of confrontation. In the course of its analysis, the Court determined that the "salient inquiry is * * * whether [the victim's] statements were made for purposes of diagnosis and treatment rather than for some other purpose." *Id.* at ¶ 47.

{¶ 46} The Court further went on to note that the trial court "retains the discretion to admit the testimony after considering the circumstances surrounding the child victim's statements." *Id.* at ¶ 48. The Court determined, "[a]t a minimum * * * a nonexhaustive list of considerations includes (1) whether the child was questioned in a leading or suggestive manner, (2) whether there is a motive to fabricate, such as a pending legal

proceeding such as a 'bitter custody battle,' and (3) whether the child understood the need to tell the physician the truth. In addition, the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of the declarations. In addition, the court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse." *Id.* at ¶ 49. (Citations omitted).

{¶ 47} S.H.W. argues that Drs. Guadalupe and Roediger both testified that the identity of the perpetrator was *not* important for purposes of their treatment and diagnosis of D.R. Therefore, S.H.W. asserts that their testimony in this regard should not have been admitted pursuant to Evid.R. 803(4). S.H.W.'s argument, however, is contradicted by the actual testimony of each doctor. When questioned about D.R.'s identification of S.H.W., Dr. Guadalupe provided the following testimony:

The State: In the course of your treatment of [D.R.], did [D.R.] make any statements to you regarding the incident which he was referred to you for?

Dr. Guadalupe: Yes.

Q: And before we get into what [D.R.] told you and without telling me who, did [D.R.] ever identify the perpetrator to you?

A: Yes.

Q: *And was it necessary for your treatment and/or diagnosis to know who this perpetrator was?*

A: *Yes.*

Q: *Why is that?*

A: *Well, for treatment in terms of the details about the alleged perpetrator, some of my concerns for treatment would have been – pardon me – would have been concerns for [D.R.] about how frequently he might cross paths with this person, the level of anxiety that [D.R.] might feel about potentially running into this person, things like that made it important for me to know at least some details about the identity.*

The State: Your Honor, before we go any further, I ask the Court to make a ruling as to whether Dr. Guadalupe is allowed to disclose who [D.R.] told her was the perpetrator.

The Court: Well, as the Court previously ruled on the State's motion in limine, I think you need to – I think you need to put the question to the expert in light of the fact that the evidence as the Court has found showed that D.R.'s mother had already taken steps to make sure that D.R. would not have any further contact with this alleged perpetrator. So why was it necessary at this point for the psychologist to – why is that necessary for treatment?

***

The State: Doctor, in regards to the fact that [D.R.]'s mother had already taken precautions to make sure that her son and the alleged perpetrator did not have contact with each other, *was it still relevant and important for you to know who the perpetrator was?*

***

Dr. Guadalupe: *The importance – the importance would not necessarily be the identity of the perpetrator but the details – for example, their previous relationship. That makes a difference in treatment, if there is an ongoing and trusting relationship, that might lead to different implications for emotional reactions and treatment rather than if it was somebody that was – that was not known to [D.R.]. So the closeness of the relationship was important to determine.*

{¶ 48} When questioned regarding D.R.'s identification of S.H.W. as the perpetrator of the abuse, Dr. Roediger provided the following testimony:

The Court: All right. I've got a question. I think this may be what you were trying to go through with [defense counsel]. Doctor, for the purposes of your diagnosis of a patient, is the identity of the alleged perpetrator a necessary piece of the information (indiscernible)?

Dr. Roediger: That's a complicated question, Your Honor. I think if at all possible, if a child or adolescent is able to provide information to me as a physician regarding either the identity and/or the approximate age of the alleged perpetrator, especially in cases of sexual maltreatment, it is of assistance to me in the care of a patient presenting with sexual abuse concerns, in that it does help direct the nature of the testing that may be conducted for a child or adolescent.

In that, for instance, when [D.R.] reported to me who the alleged perpetrator was in this particular case, and confirmed at least to the best of [D.R.]'s knowledge and approximate age, which, again, did confirm the

information that had been privately shared with me by the biological mother, it, again, heightened my concern for the possibility that [D.R.] may have been exposed to sexually transmitted infections given the age of the alleged perpetrator and directing me to advise the mother that we should do cultures for sexually transmitted infection and bloodwork for sexually transmitted infection knowing that there could be a potential risk of exposure given the disclosure that [D.R.] shared with me in terms of the type of sexual contact he indicated had reportedly occurred between him and the alleged perpetrator, so, yes, Your Honor. If a child is able to tell me the name and/or identity of the party and whether that may be a grownup or a big kid or a little kid brings this in their own words, sir, it is of assistance.

**{¶ 49}** Upon review, we conclude that the trial court did not abuse its discretion by permitting Drs. Guadalupe and Roediger to testify regarding D.R.'s identification of S.H.W. as the perpetrator of the sexual abuse pursuant to Evid.R. 803(4). D.R.'s statements to both doctors were made for purposes of medical diagnosis and treatment. There is no suggestion herein that D.R. was not truthful. There is no suggestion of a motive for fabrication on D.R.'s part. Dr. Roediger was responsible for a medical and psychological evaluation of D.R. Specifically, Dr. Roediger was concerned that D.R. may have been exposed to a sexually transmitted disease based on the nature of the sexual contact that he reported. Dr. Guadalupe was concerned with an increase in D.R.'s anxiety levels brought on by the sexual abuse. Both doctors affirmatively testified that the identity of the perpetrator was important for purposes of their treatment and diagnosis of D.R. Accordingly, we conclude that the trial court did not abuse its

discretion when it admitted D.R.'s statements to his treating physicians with respect to the identity of the person who sexually abused him pursuant to Evid.R. 803(4).

**{¶ 50}** S.H.W.'s third assignment of error is overruled.

**{¶ 51}** S.H.W.'s fourth assignment of error is as follows:

**{¶ 52}** "THE EVIDENCE WAS INSUFFICIENT TO SUPPORT AN ADJUDICATION OF RAPE AND GROSS SEXUAL IMPOSITION AND THE TRIAL COURT'S FINDING OF DELINQUENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶ 53}** In his fourth assignment, S.H.W. argues that his adjudications of delinquency for rape and gross sexual imposition were not supported by sufficient evidence. S.H.W. also contends that his adjudications of delinquency were against the manifest weight of the evidence.

**{¶ 54}** A sufficiency-of-the-evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses. *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998), citing *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 55} In contrast, when reviewing a judgment under a manifest-weight standard of review, " '[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 56} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley,* 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 57} S.H.W. was adjudicated delinquent for one count of rape, in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree if committed by an adult; and two counts of GSI, in violation of R.C. 2907.05(A)(4), both felonies of the third degree if committed by an adult.

{¶ 58} The offense of rape requires proof of the following elements:

(A)(1) No person shall engage in sexual conduct with another who is not the

spouse of the offender or who is the spouse of the offender but is living

separate and apart from the offender, when any of the following applies:

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶ 59} GSI requires proof of the following elements:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 60} " 'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 61} Initially, we note that S.H.W. argues that his adjudications are based on insufficient evidence and against the manifest weight because the trial court improperly admitted D.R.'s statements to his mother, Dr. Roediger, and Dr. Guadalupe. Without that evidence, S.H.W. asserts that there is insufficient evidence to support his adjudications. However, as stated in assignments of error I, II, and III, we found that the trial court did not err in admitting D.R.'s statements to his mother and both of the doctors. Thus, S.H.W.'s argument is without merit in this regard.

{¶ 62} S.H.W. further argues that the evidence adduced was insufficient to support his adjudications of delinquency for GSI because the State failed to establish he engaged in sexual contact with D.R. for the purpose of sexual gratification. For purposes of the

crime of rape, which requires proof of "sexual conduct", the definitions of sexual conduct in R.C. 2907.01(A) necessarily imply that the actor's motive is sexual gratification, and so no further proof of sexual gratification is required when sexual conduct is proved. *State v. Gillingham*, 2d Dist. Montgomery No. 20671, 2006-Ohio-5758, ¶ 31. However, sexual contact, as defined by R.C. 2907.01(B), does not necessarily imply that the actor's purpose was sexual gratification. *Id.* In the absence of direct testimony regarding sexual arousal or gratification, the trier of fact may infer a purpose of sexual arousal or gratification from the " 'type, nature and circumstances of the contact, along with the personality of the defendant. From these facts, the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim. If the trier of fact determines, that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved.' " *State v. Mundy,* 99 Ohio App.3d 275, 288–289, 650 N.E.2d 502 (2d Dist.1994), quoting *State v. Cobb,* 81 Ohio App.3d 179, 185, 610 N.E.2d 1009 (9th Dist.1991).

{¶ 63} In the instant case, the record clearly establishes that S.H.W.'s actions were done for the purpose of sexual gratification. Specifically, the evidence adduced at trial established that S.H.W. took D.R. into a secluded bathroom where he put his finger and penis into D.R.'s buttocks. The evidence also established that S.H.W. made D.R. touch his penis, and he then touched D.R.'s penis. Therefore, we conclude that sufficient evidence was adduced at trial whereby the judge could find that S.H.W.'s purpose in touching D.R.'s penis and having D.R. touch his penis was for sexual gratification or arousal.

{¶ 64} S.H.W. further argues that there was insufficient evidence of venue. Venue is not a material element of any crime, but is a fact that must be proven beyond a reasonable doubt. *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). "In the prosecution of a criminal case, it is not essential that the venue of the crime be proved in express terms, provided it be established by all the facts and circumstances, beyond a reasonable doubt, that the crime was committed in the county and state as alleged in the affidavit." *State v. Gribble*, 24 Ohio St.2d 85, 263 N.E.2d 904 (1970), paragraph two of the syllabus.

{¶ 65} In the case at bar, sufficient evidence was adduced to establish that the sexual abuse occurred in Yellow Springs, Greene County, Ohio. M.R. testified that S.H.W. was babysitting D.R. at Mills Lawn Park in Yellow Springs when the incident occurred. S.H.W.'s sister testified that she and M.R. were looking for D.R. and the appellant at Mills Lawn Park when the sexual abuse occurred. Det. Penrod testified that due to the short time frame in which the sexual abuse occurred, the only place the offenses could have occurred was in Yellow Springs. Clearly, the State adduced sufficient evidence to establish that the sexual abuse occurred in Greene County, Ohio. Accordingly, we conclude that the State adduced sufficient evidence at trial to support S.H.W.'s adjudications of delinquency for rape and gross sexual imposition.

{¶ 66} Lastly, S.H.W. asserts that the trial court adjudications of delinquency were against the manifest weight of the evidence for the following reasons: 1) M.R.'s testimony regarding the timetable of events establishes that there was an insufficient amount of time for S.H.W. to have committed the instant offenses; 2) there was some evidence adduced which established that the Mills Lawn School may have been locked at the time the

offenses occurred; 3) the polygraph results implicating S.H.W. lack credibility; and 4) the trial court based its decision upon evidence not in the record. S.H.W.'s arguments are without merit.

{¶ 67} The credibility of the witnesses and the weight to be given to their testimony were matters for the trial court, as the trier of fact, to determine. The trial court did not lose its way simply because it chose to believe the testimony of M.R., who testified at length regarding what she personally observed on the night the offenses occurred, as well as what D.R. told her about what S.H.W. did to him. While some evidence was adduced that the Mills Lawn School ordinarily was locked at the time the offenses were alleged to have occurred, several witnesses testified that the school could have been open as well. John Gudgel testified that the door to the school could have been unlocked by the custodian because of the neighborhood watch meeting being held at the school that evening. Det. Penrod also testified that the school was unlocked on Tuesday nights (the day the offenses occurred) because there were Zumba classes held at that time which she personally attended, although not on the night in question. Furthermore, there is no evidence in the record that the trial court placed undue weight on the results of the polygraph examination in adjudicating S.H.W. delinquent of one count of rape and two counts of GSI. Finally, the record fails to establish that the trial court based its decision on matters not in evidence. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice has occurred.

{¶ 68} S.H.W.'s fifth assignment of error is as follows:

{¶ 69} "TRIAL COUNSEL WAS INEFFECTIVE FOR PERMITTING APPELLANT

TO SUBMIT TO A POLYGRAPH EXAMINATION AND STIPULATING TO THE RESULTS TO APPELLANT'S PREJUDICE."

{¶ 70} In his fifth assignment of error, S.H.W. argues that he received ineffective assistance when his counsel permitted him to submit to a polygraph examination and stipulated to the results of the examination.

{¶ 71} A claim of ineffective assistance of trial counsel requires both a showing that trial counsel's representation fell below an objective standard of reasonableness, and that the defendant was prejudiced as a result. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The prejudice prong requires a finding that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, with a reasonable probability being "a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

{¶ 72} The Supreme Court of Ohio discussed the admissibility of polygraph examinations in *State v. Souel,* 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978). The *Souel* court stated the following:

The results of a polygraphic examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment, provided that the following conditions are observed:

(1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the

subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

(2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

(3) If the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

(a) the examiner's qualifications and training;

(b) the conditions under which the test was administered;

(c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and,

(d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given.

*Id.* at syllabus.

{¶ 73} In *State v. Lascola*, 61 Ohio App.3d 228, 572 N.E.2d 717 (10th Dist.1988), the appellate court stated the following, which we find instructive:

*When a defendant agrees to undergo a polygraph test, presumably he*

*knows whether he is telling the truth and is willing to assume the risk of error. It is completely within his knowledge and control whether to make the decision.   * * ***

*Id.* at 234, 572 N.E.2d 717; emphasis added.

{¶ 74} The polygraph stipulation, which bears the signatures of both counsel and S.H.W., complied with all of the requirements set forth in *Souel.*  The document is clearly and carefully crafted.   It unambiguously cautions against the potential ramifications of an accused's decision to take the test.   Furthermore, as indicated above, defense counsel vigorously cross-examined the polygraph examiner, challenging all "matter[s] deemed pertinent" as contemplated by *Souel,* including "the limitations of and possibilities for error" in the examination process.   We note that the fourth *Souel* factor does not apply in the instant case because the proceedings were before a juvenile court, and there was no jury.

{¶ 75} We note that S.H.W. voluntarily entered into the polygraph stipulation, and the record establishes that the decision to take the polygraph examination originated with him.   Additionally, if S.H.W. had passed the polygraph examination, pursuant to terms of the stipulation, the State would have been required to dismiss the case.   The decision to permit S.H.W. to submit to a polygraph examination and stipulate to the results of the examination was a calculated risk that clearly falls within the realm of trial tactics, and thus, did not constitute ineffective assistance of counsel. *State v. Lodge*, 2d Dist. Greene No. 2004 CA 43, 2005-Ohio-1908, ¶ 40.   In any event, S.H.W. has failed to demonstrate that there is a reasonable probability that but for defense counsel's actions, the result of the trial would have been different.

{¶ 76} S.H.W.'s fifth assignment of error is overruled.

{¶ 77} S.H.W.'s sixth and final assignment of error is as follows:

{¶ 78} "THE JUVENILE COURT COMMITTED CUMULATIVE ERROR TO THE PREJUDICE OF APPELLANT."

{¶ 79} "[S]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. *State v. Madrigal,* 87 Ohio St.3d 378, 2000–Ohio–448, 721 N.E.2d 52. In order to find 'cumulative error' present, we must first find that multiple errors were committed at trial. *Id.* at 398, 721 N .E.2d 52. We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Thomas,* Clark App. No. 2000–CA–43, 2001–Ohio–1353." *State v. Kelly,* 2d Dist. Greene No. 2004–CA–20, 2005–Ohio–305, ¶ 33. "Where no individual, prejudicial error has been shown, there can be no cumulative error. *State v. Blankenship* (1995), 102 Ohio App.3d 534, 557, 657 N.E.2d 559." *State v. Jones,* 2d Dist. Montgomery No. 20349, 2005–Ohio–1208, ¶ 66.

{¶ 80} In light of our foregoing analysis, we find that S.H.W. has failed to establish that any errors occurred in the instant case. *State v. Moreland,* 50 Ohio St.3d 58, 69, 552 N.E.2d 894 (1990). Thus, we fail to see how the absence of error can constitute cumulative error. *Id.*

{¶ 81} S.H.W.'s sixth and final assignment of error is overruled.

{¶ 82} All of S.H.W.'s assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Nathaniel R. Luken
Michael T. Columbus
Hon. Adolfo Tornichio